REPUBLIC RICE MILL, INC., Appellant,

v.

EMPIRE RICE MILLS, INC. and American Casualty Company, Appellees.

No. 17100.

United States Court of Appeals Eighth Circuit.

Feb. 27, 1963.

Rehearing Denied March 26, 1963.

John H. Haley, Little Rock, Ark., for appellant.

Joe C. Barrett, Jonesboro, Ark., for appellee and James Robertson, Wynne, Ark., and Malcolm Gannaway, Little Rock, Ark., with him on the brief.

Before VOGEL, BLACKMUN and RIDGE, Circuit Judges.

VOGEL, Circuit Judge.

Republic Rice Mill, Inc., plaintiff-appellant, brought this suit for damages against Empire Rice Mills, Inc., and its surety, American Casualty Company, defendants-appellees. C. O. Wofford and Jess Brown were made third-party defendants by American Casualty Company because of an indemnity contract entered into in connection with a warehousing bond issued by American Casualty Com-

pany in behalf of Empire. Jurisdiction is based upon diversity and amount involved.

Republic is a Louisiana corporation engaged in the business of milling rice. Empire is an Arkansas corporation engaged in the business of drying, warehousing and milling rice at Fair Oaks, Arkansas, and is the primary defendant in this action. In 1954 Empire realized that the rice harvest would be large and that there was a substantial shortage of facilities for warehousing rough rice. To meet the demand for storage facilities, Empire entered into an agreement with various local producers and thereupon erected a quonset-type building 220 feet long and 80 feet wide for rice storage. Rice was placed in the building by means of a screw conveyor extending the full length of the building and located near the center of the roof. Rice was removed by a similar conveyor in the floor. Commodity Credit Corporation approved the plans for the building and after construction inspected the completed structure, approving it for storage of rice under the form of Uniform Rice Storage Agreement then in use. When filled with rough rice the quonset building contained approximately 240,000 bushels grown by 80 or more producers in the area. At the time of harvesting, the moisture content of the rice ranged from 18% to 24%. For storage the moisture content may not safely exceed 14%. Accordingly, to prepare the green rice for storage the moisture content had to be reduced through heat application. Empire received the green rice from the producers, dried it and then placed it in the quonset building for storage. Only rice of Zenith variety U. S. No. 2 grade

was placed in the building. Upon demand, Empire issued to the various producers owning the rice negotiable warehouse receipts showing the number of bushels, the net weight, from whom it was received, the variety, the grade, and that it was stored as Lot 1 *Modified Commingled*.[1]

During the filling of the quonset building with rice, a representative of the Cross County A.S.C. office took and preserved samples which were subsequently sent to the Stuttgart office of the United States Agricultural Marketing Service for inspection as to variety, grade and milling yield. These factors affected the loan rate per bushel which would be approved by Commodity Credit Corporation. (The Rice Inspection Certificate dated November 1, 1954, which resulted from such sampling, showed "milling yield 40%–67%".) Upon presentation of his warehouse receipt to the Cross County A.S.C. office, the producer would receive the appropriate amount of money based upon the schedule furnished that office by CCC that was applicable to the inspection certificate. The warehouse receipts were delivered to the A.S.C. office for the account of CCC.

On March 15, 1955, CCC, pursuant to its loan agreement with the producers, took title to all rice for which it held warehouse receipts. In preparation for the takeover, CCC caused the Agricultural Marketing Service through its Jonesboro, Arkansas, office to again sample the rice in the quonset building. James Hammil, inspector for the Agricultural Marketing Service, made the sampling. On the basis thereof he issued on February 17, 1955, rice inspection certificates on Form UR–103 in sufficient

---

1. Section 18(m) of the Uniform Rice Storage Agreement gives the following definition:

   "MODIFIED COMMINGLED—The storage or handling of rice in bulk by commingling in one lot rice of a single class and of a similar grade and quality owned by two or more persons, in such manner that rice actually deposited in that lot prior to the issuance of warehouse receipts thereon, and no other, may be delivered to the holder of each warehouse receipt issued with respect to such rice. The warehouse receipts issued for all of such rice must show the official grade determined on the basis of a representative sample of all rice included in the lot, and the warehouse receipts or accompanying documents must show the number of the bin in which the lot was originally accumulated and must be marked in a manner acceptable to Commodity that the rice is stored modified commingled."

numbers to accompany each warehouse receipt for rice in the building. The certificates he issued were identical except as to quantity of rice involved and the name and address of the producer. Each certified the kind and grade as "U. S. No. 2 Zenith rough rice, milling yield 46%–68%". The milling yield certified on these certificates by Hammil was therefore substantially higher than that certified by the Stuttgart office shortly after the rice was put in permanent storage. Commodity made final settlement with the producers and took title to the rice on the basis of the Hammil certificates.

Since there was no open market for rough rice at prices equal to or in excess of loan amounts advanced to the producers by CCC, the latter established a milling program to convert the rough rice into milled rice, dividing the rice in the quonset building into twelve offering lots for sale. CCC would from time to time make public offerings for "sale of CCC owned rough rice and exchange of rough rice for milled rice". Attached to such offering was a "Schedule of Availability of Rough Rice for Sale or Exchange" showing the offer and lot number, warehouse receipt number, quantities in pounds, grade, milling yield, total value, name and location of warehouse, and whether the rice was stored commingled, modified commingled or identity preserved. Millers were expected to pay Commodity the total value of rough rice as computed by it and then bid on what price the miller would deliver the milled rice back to Commodity. The terms and conditions of Commodity's offer included, among other things, the following:

"*Availability for Inspection*—A sample of each lot of rough rice shown on supplemental schedules will be made available for inspection at the warehouse location by the warehouseman during his business hours. If the miller is not satisfied with the available sample, he may request another sample which will be drawn by the warehouseman at the expense of the miller."

"*Modified Commingled Storage*—Warehouseman guarantees quantity shown on warehouse receipts but responsibility for quality is the same as if the rice was stored 'identity preserved';"

"*Identity Preserved Storage*—Warehouseman is responsible for maintaining the identity of the lot of rice and is responsible for quality and quantity only if deficiencies result from his failure to perform warehousing functions as a reasonably prudent owner would perform them."

"F. *Weights, Grades, and Milling Yield—Rough Rice*—It shall be conclusive between CCC and the miller that in all sales made by CCC the weights, grades, and milling yield on all rough rice transferred by delivery of warehouse receipts to the miller, shall be the same as that shown on the applicable supplemental schedules irrespective of the actual weights, grades, and milling yield of the rice actually delivered by the warehouseman to the miller under his warehouse receipts."

"CCC makes no warranty as to the grade, weight, or milling yield of any of the rough rice covered by warehouse receipts to be sold under this Announcement."

It was the custom of the community for millers who bid on Commodity Credit Corporation rice to do their own sampling. With the exception of Republic, rice millers bidding upon the rice in the quonset building consistently sampled and inspected the rice to determine the quality before making bids. Republic in bidding did not sample or inspect but relied upon the milling yield certified by Hammil on February 17, 1955. On July 25, 1955, Republic, as the successful bidder, became the owner of the final portion of rice stored in the quonset building. Empire, which did sample, became the successful bidder on all other lots in the quonset building. Upon delivery and milling, the rice purchased by Republic was found to have an average

milling yield substantially less than reflected by the Hammil certificates dated February 17, 1955.[2] Republic claimed in this suit that Empire as a warehouseman stored rice of dissimilar quality in the same lot in violation of the terms of the Uniform Rice Storage Agreement, that rice placed in storage in one lot from several producers should be of similar quality, and that milling yield was the foremost element of quality. Republic states that it was the duty of Empire to match the grades and milling yields of the rices so that a delivery of any portion of the rice to a holder of any one of the warehouse receipts would be an equitable delivery of rice whose milling yield closely corresponded to the overall average. It contends that by dumping millions of pounds of rice into a single bin, the rice having wide variations of milling yield, the nature of "modified commingled" storage was destroyed and that no portion would be representative of the whole. It further contends that the rice was thus actually stored as "commingled" and Empire became the insurer of grade, quality and milling yield as well as quantity and class.[3] It brought this suit to recover from Empire for the difference in value of rice having a milling yield of 46%–68% and the milling yield actually obtained.

The case was tried to the court without a jury, resulting in findings of fact, conclusions of law and judgment in favor of defendant-appellee Empire. The District Court held that there was substantial compliance with the Uniform Rice Storage Agreement provisions; that Commodity's offer put the millers on notice to sample and inspect the rough rice before purchase; that Empire was not bound by the rice inspection certificates; and that Empire was not responsible to the purchasers for any deficiency in milling yield.

In appealing to this court, Republic assigns as error the findings of fact that the rice was stored in compliance with the Uniform Rice Storage Agreement and that Empire was not liable for deficiency in milling yield; the conclusion that Commodity's offer to millers excused Empire for any breach of the URSA; and the conclusion that Empire was not bound by the certificates of milling yield issued by the Agricultural Marketing Service inspectors.

In Republic's first claimed error, it attacks as erroneous the District Court's finding of fact No. 33 which found no deterioration in the quality of the rice nor negligence on the part of the warehouseman; No. 34 which found it impractical for Empire to have determined the milling yield at the time the rice was placed in storage; and No. 35 which found substantial compliance by Empire with the Uniform Rice Storage Agreement.

■ As stated, this case was tried to the court without a jury. Rule 52, Federal Rules of Civil Procedure, 28 U.S.C.A., provides that:

"* * * Findings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses."

---

2. Empire's experience on the other lots on which it was the successful bidder was that the milling yield was even less than that estimated by their own samples.

3. Section 13(d) of the Uniform Rice Storage Agreement limits liability for rice stored "modified commingled" as follows:

"In the case of rice stored *modified commingled*, the warehouseman shall be liable for any shortage or shrinkage in weight and for failure to deliver rice of the class specified from the rice stored in the identical lot against which the warehouse receipt was issued. The warehouseman shall not be liable for deficiencies in grade or quality unless such deficiencies result from his failure to use due care, his failure to provide appropriate warehousing services, his failure to deliver the rice as directed by Commodity and in accordance with his representation as to loading out capacity made in his 'Application for Approval', or his failure to notify Commodity as provided in section 10(b) of threatened deterioration with respect to which a prudent warehouseman would have given notice. * * *"

In Nelson v. Seaboard Surety Company, 8 Cir., 1959, 269 F.2d 882, at page 886, we said:

"The findings of fact of a trial judge sitting without a jury should not be set aside unless it is clearly demonstrated that they are without adequate evidentiary support in the record or were induced by an erroneous view of the law. Pacific National Fire Ins. Co. v. Mickelson, 8 Cir., 235 F.2d 425, 428; Pendergrass v. New York Life Ins. Co., 8 Cir., 181 F.2d 136, 138."

With this in mind, we examine the challenged findings.

■ As to Finding No. 33, there is no evidence in the record to justify a contrary conclusion. Additionally, Republic admits, "It is undisputed that Empire exercised due care in keeping up the condition of the rice after it had been placed in storage. And there is no doubt that the rice brought in by the ninety producers and placed by Empire in one lot was of a single class and of similar grade." What Republic really complains of is that rice of dissimilar quality was placed in the same lot but there is no evidence that there was deterioration in quality during the time the rice was stored, nor was there negligence established on the part of Empire.

Finding No. 34 is not a clearly erroneous finding. Green rice as it was received from the several producers was concentrated in a bin containing 10,000 to 12,000 bushels during the day and drying processes started that night. Accordingly, the ultimate place of permanent storage had to be determined while the rice was in its green state. There was definite conflict in the testimony as to whether or not milling yield of green rice could be determined at the time it was stored in the quonset building. Substantial testimony supports the court's conclusion that there is no practical way of making a determination of milling yield of green rice.

Finding No. 35 again is supported by substantial testimony when viewed in light of the conditions that existed during and following the harvest of 1954, the approval by Commodity of the quonset building for storage, and its approval of the procedure followed in filling the building with green rice. All this evidence amply supports the conclusion that Empire complied with the conditions of "modified commingled" storage to the extent practicable under the existing conditions.

In support of claimed error No. 2, Republic cites to us our case of Western Surety Company v. Redman Rice Mills, Inc., 8 Cir., 1959, 271 F.2d 885. There this court sustained a finding of liability against a warehouseman for damages sustained by purchasers of warehouse receipts. That case and this are in nowise parallel. There we said, at page 892:

"* * * Although this action is premised upon a breach of the contract, *fundamentally, the issue is whether the rice deteriorated in quality as the result of the failure of Essex to exercise due care, as a warehouseman, in caring for the property.* If so, Essex was guilty of negligence which in turn furnished the basis for breach of the provisions of the contract contained in sections 10(c) and 13(e), supra." (Emphasis supplied.)

On substantial evidence, the trial court there found a warehouseman guilty of negligence in failing to care for the stored rice, resulting in its being stack burned. That is not our situation here and that case is not support for Republic's contention.

■ The provisions of the offer of Commodity constituted a clear warning to bidders that samples of the rice in the quonset building were available for inspection, that if not satisfied other samples could be drawn, that the warehouseman guaranteed quantity and was held only for failure to perform warehousing functions the same as a reasonably prudent owner would perform them; and, additionally, that Commodity made no

warranty as to grade, weight or milling yield of any of the rice offered for sale. We think the trial court's conclusion an entirely sound one under all the circumstances in this case.

■ As to the third claimed error, the appellant challenges Finding of Fact No. 36 to the effect that the sample taken by Hammil on which he issued the February 17, 1955, inspection certificates was not representative of all the rice stored in the quonset building and the District Court's conclusion No. 1 to the effect that Empire, not having participated in any certification of milling yield, was not bound by the certificates of the Agricultural Marketing Service. We believe it clear that Finding of Fact No. 36 is entirely correct and that the Hammil sample was not representative. Obviously, it was not representative or it would have disclosed the true milling yield. It should be pointed out that the storage of rice in 1954 was on an emergency basis, that the quonset building was inspected and received the approval of Commodity; that Empire's method of storing the rice in the quonset building also received the approval of Commodity; that the initial inspection of the rice in November 1954 was between the owners of the rice and Commodity and was for the purpose of determining the amount Commodity would loan on the rice to the owners. The second inspection of February 1955 was again a matter between the owners and Commodity and was solely for the purpose of determining the final settlement figures whereby Commodity took over ownership of the rice and paid the growers therefor. Settlement was made on the basis of such February 1955 inspection. Again, Empire did not enter into that picture. After Commodity became the owner of the rice and offered it for sale, it very clearly avoided making any warranty as to grade, weight or milling yield and advised the bidders of the fact that the samples were available for inspection and the rice was ready for additional sampling. When we add thereto the fact that it was the established custom of millers before bidding for rice offered for sale by CCC to do their own sampling and that Republic in this instance failed to comply with such custom but chose, instead, to rely on the February 1955 certificates regarding milling yield, we are forced to agree that the District Court properly found no liability on the part of Empire. The District Court's entire findings and conclusions are neither clearly erroneous nor based upon an erroneous view of the law.

Affirmed.