Daniel L. SHULL, Appellant,

v.

DAIN, KALMAN & QUAIL, INC., a corporation, and Harry Ware, Appellees.

No. 76–1935.

United States Court of Appeals, Eighth Circuit.

Submitted May 18, 1977.

Decided Aug. 26, 1977.

Rehearing Denied Sept. 26, 1977.

John Stevens Berry (made rebuttal), Friedman & Berry, Lincoln, Neb., filed appearance, made argument, filed appendix, appellant's brief and appellant's reply brief for appellant.

James H. O'Hagan, Dorsey, Windhorst, Hannaford, Whitney & Halladay, Minneapolis, Minn., Kenneth C. Stephan, Lincoln, Neb. (argued), and Roger Magnuson, Edward Pluimer, Minneapolis, Minn., on brief, for appellees.

Before BRIGHT and HENLEY, Circuit Judges, and BENSON, Chief District Judge.*

HENLEY, Circuit Judge.

During 1972 and 1973 plaintiff, Daniel L. Shull of Lincoln, Nebraska, speculated heavily in a certain corporate stock, referred to in the record and briefs as Champion Home Builders stock (Champion). In 1972 he bought largely on margin and borrowed large sums of money from Nebraska banks to make the required down payments and meet margin calls. During most of the first half of 1972 the price of the stock rose sharply; it then fell dramatically and continued to fall throughout 1973. Plaintiff dealt with the brokerage firm of Dain, Kalman & Quail, Inc. (DKQ) of Minneapolis, Minnesota; his actual dealings were with Harry Ware, DKQ's branch manager in Lincoln. On June 5, 1975 plaintiff commenced this action in the district court against DKQ and Ware seeking to recover damages to compensate him for his losses.

The complaint, as amended, was in eleven counts and was broadly based. It was alleged that Ware and DKQ, acting through Ware, violated: (1) The Securities Act of 1933, 15 U.S.C. §§ 77a et seq.; (2) the Securities Exchange Act of 1934, 15 U.S.C. § 78a et seq.; (3) Rule 10(b)(5) of the Securities & Exchange Commission, 17 C.F.R. § 240.10(b)(5); (4) Regulation "T" of the Board of Governors of the Federal Reserve System issued pursuant to § 7 of the 1934 statute that has been mentioned; (5) certain rules of the New York Stock Exchange and of the National Association of Security Dealers issued pursuant to §§ 6, 15A and 19 of the 1934 statute; (6) the Nebraska Securities Act, Neb. R.R.S. §§ 8–1101 et seq., as amended. Plaintiff also alleged that the defendants had been guilty of common law fraud, deceit, negligence and breach of fiduciary duty. No question has been raised as to federal subject matter jurisdiction, and such jurisdiction is established.

The tenth count of the complaint which charged negligence and breach of duty was dismissed without prejudice. The remaining counts were tried without a jury before Chief District Judge Warren K. Urbom. At the conclusion of plaintiff's case the defendants moved for judgment pursuant to Fed. R.Civ.P. 41(b). On September 30, 1976 the district court filed a full memorandum opinion, granted the defense motion, and dismissed Counts I–IX and XI of the complaint with prejudice. This appeal followed.

Rule 41(b) provides that after a plaintiff has completed his case in the course of a nonjury trial, the defendant, without waiving his right to introduce evidence should his motion be denied, may move for judgment on the ground that the plaintiff has shown no right to relief. If such a motion is made, the trial court, as trier of the facts, is to determine them and may render judgment against the plaintiff or may decline to render any judgment until the close of all of the evidence. If the motion is granted, the trial court is required to make findings as required by Rule 52(a).

Speaking of the standard that a district court is required to apply in passing on a Rule 41(b) motion and the review standard that we apply in passing upon the action of a district court in granting such a motion, we said recently in *Lang v. Cone*, 542 F.2d 751, 754 (8th Cir. 1976):

---

* The Honorable Paul Benson, Chief District Judge, District of North Dakota, sitting by designation.

The function that a trial judge performs in passing upon a Rule 41(b) motion in a nonjury case is not the same as the function that a trial judge performs in the course of a jury trial when he is called upon to rule on a defense motion for a directed verdict at the close of the plaintiff's case or at the close of all of the evidence. In the latter case the judge simply decides whether there is substantial evidence to take the case to the jury, and in making that determination he is required to view the evidence in the light most favorable to the plaintiff, and to give the plaintiff the benefit of all favorable inferences reasonably to be drawn from the evidence. In a Rule 41(b) situation, however, the district court may find the facts itself and may render judgment against the plaintiff if the court considers that plaintiff has not made out a case, and if the district court sustains the Rule 41(b) motion, its findings will not be reversed on appeal unless clearly erroneous. *Smith v. South Central Bell Telephone Co.*, 518 F.2d 68 (6th Cir. 1975); *Taylor v. Honeywell, Inc.*, 497 F.2d 1382 (10th Cir. 1974); *Palmentere v. Campbell*, 344 F.2d 234 (8th Cir. 1965); 9 Wright and Miller, Federal Practice & Procedure, § 2371.

■ It is familiar law, of course, that a factual finding of a district court is "clearly erroneous" if it is not supported by substantial evidence or, even though there be substantial evidence to sustain it, the reviewing court is clearly satisfied that a mistake has been made. However, it is not the function of an appellate court to try the case de novo, or to pass upon the credibility of witnesses or on the weight to be given to their testimony, and a finding is not clearly erroneous simply because a different result might have been reached had the case been tried originally to the appellate court. However, a factual finding that is based upon the application of an erroneous legal standard cannot be upheld. *See* in general *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 89 S.Ct. 1562, 23 L.Ed.2d 129 (1969); *United States v. United States Gypsum Co.*, 333 U.S. 364, 68 S.Ct. 525, 92 L.Ed. 746 (1948); *United States v. Wright*,

428 F.2d 445 (8th Cir. 1970); *Minneapolis, St. Paul & S. S. M. R. Co. v. Metal-Matic, Inc.*, 323 F.2d 903 (8th Cir. 1963); *Republic Rice Mill, Inc. v. Empire Rice Mills, Inc.*, 313 F.2d 717 (8th Cir. 1963); *Blackhawk Hotels Co. v. Bonfoey*, 227 F.2d 232 (8th Cir. 1955); *Noland v. Buffalo Ins. Co.*, 181 F.2d 735 (8th Cir. 1950); *Hudspeth v. Esso Standard Oil Co.*, 170 F.2d 418 (8th Cir. 1948). *See also* 9 Wright and Miller, Federal Practice & Procedure, §§ 2585–86, pages 729–40.

Before going further, we find it desirable to refer to the individual counts of the complaint since an advance familiarity with those counts should make our statement of the facts and discussion of the issues a good deal more intelligible.

Count I alleged a private civil action based on an alleged violation of § 12(2) of the Securities Act of 1933, 15 U.S.C. § 77*l* (2). That statute imposes liability on anyone who offers or sells a security by use of a communication that includes an untrue statement of a material fact or omits to state a material fact necessary to make the statements that have been made not misleading. Suit under § 12(2) must be filed within one year after the injured party discovers the misstatement or omission or should have discovered it by the exercise of ordinary care. 15 U.S.C. § 77m.

Count II alleged a violation of § 17(a) of the 1933 Act, 15 U.S.C. § 77q(a). Section 17(a) makes it unlawful for one to employ fraudulent or deceptive devices in connection with the sale of securities. However, it does not confer in terms a private cause of action in favor of a person who purchases a security that has been sold to him in violation of the section. In *Greater Iowa Corp. v. McLendon*, 378 F.2d 783, 788–90 (8th Cir. 1967), we held that the private remedy of a purchaser must be found in § 12(2) and not in § 17(a).

Count III was based on § 9 of the 1934 Act, 15 U.S.C. § 78i. Section 9(a)(4) makes it unlawful for any dealer, broker or other person selling or offering to sell a security to make a statement about it which he knows to be false or misleading or which he

had reasonable grounds to believe was false or misleading. And § 9(e) creates a private cause of action in favor of a person who has suffered damage as a result of purchasing a security at a price that had been affected by a violation of § 9(a).

The district court thought that the primary thrust of plaintiff's claim was to be found in Count IV which was based on § 10(b) of the 1934 Act and on Rule 10(b)(5) of the Securities & Exchange Commission. In relevant part, the Rule, which accords with the statute, is as follows:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,

in connection with the purchase or sale of any security.

In *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976), the Supreme Court held that a suit based on § 10(b) and Rule 10(b)(5) cannot be successfully maintained on the basis of negligence alone, and that in order to prevail a plaintiff must show scienter, that is to say a fraudulent, deceptive or manipulative intent.

In Count V plaintiff claimed a violation of Regulation "T" of the Board of Governors of the Federal Reserve System (Federal Reserve Board), 12 C.F.R., Part 220, that was issued pursuant to the authority conferred by § 7(c) of the 1934 Act, 15 U.S.C.

§ 78g(c). That section and § 7(d), 15 U.S.C. § 78g(d), authorize the Board to restrict margin transactions on the stock market and to impose credit controls on brokers, dealers and others, including banks. The credit controls imposed on brokers and dealers are to be found in Regulation "T", and those imposed on banks are to be found in Regulation "U," which appears as 12 C.F.R., Part 221.[1]

When Regulation "T" and Regulation "U" are read together, it appears that while a stock broker may to a limited extent give credit to his margin customers or arrange for an extension of credit to them by others, a broker violates Regulation "T" if he "arranges" for a bank to extend credit to a margin customer in violation of that part of Regulation "U" which appears as 12 C.F.R. § 221.1(a). It appears that if a violation of Regulation "T" causes the offending broker's customer to suffer damage, the customer has a cause of action against the broker. *Pearlstein v. Scudder & German*, 429 F.2d 1136 (2d Cir. 1970), *cert. denied*, 401 U.S. 1013, 91 S.Ct. 1250, 28 L.Ed.2d 550 (1971); *Junger v. Hertz, Neumark & Warner*, 426 F.2d 805 (2d Cir.), *cert. denied*, 400 U.S. 880, 91 S.Ct. 125, 27 L.Ed.2d 118 (1970). Similarly, a customer has a cause of action against a bank which has made a loan to him in violation of Regulation "U." *See Goldman v. Bank of Commonwealth*, 467 F.2d 439 (6th Cir. 1972).

Counts VI, VII and VIII alleged, respectively, violations of Rule 405 and Rule 342(a) of the New York Stock Exchange and Article III, § 2 of the Rules of Fair Practice of the National Association of Security Dealers.

The Stock Exchange Rules were promulgated under §§ 6 and 19 of the 1934 Act, 15 U.S.C. §§ 78f and 78s, and the Association's Rules were issued as provided by 15 U.S.C. § 78o–3 which was added to the 1934 Act in 1938.

---

1. Count V refers to both Regulation "T" and Regulation "U." However, plaintiff is not seeking any relief against any of the banks from which he borrowed money, and it appears to us that his allegations of Regulation "U" violations are relevant only as they may bear upon the Regulation "T" violations upon which he relies.

Exchange Rule 405 requires every member of the Exchange to learn essential facts about all customers and to supervise diligently all accounts handled by registered representatives of the organization. Rule 342(a) requires proper supervision by members of the conduct and operations of employees.

The Association Rule that has been mentioned requires that in recommending a security transaction to a customer the member shall have reasonable grounds for believing that the recommendation is suitable for the customer on the basis of facts, if any, disclosed by the customer with respect to his other security holdings and with respect to his financial status and needs.

Count IX was based on the Nebraska Securities Act that has been cited. That statute closely resembles the 1933 federal Act, but unlike the federal Act it has a two year statute of limitation.

As stated, Count X was dismissed without prejudice, and a cause of action based on that count may now be pending in the state courts.

Count XI alleged common law fraud and deceit in addition to the common law charge of negligence and breach of duty that had been incorporated in Count X.

The historical and background facts of the case are set out in considerable detail in the opinion of the district court. Although the defendants put on no proof at the trial of the case, the plaintiff called Ware as an adverse witness and also introduced his discovery deposition. The evidence that the district court heard was sharply conflicting in certain areas, and Judge Urbom did not try to resolve all of the conflicts. It seems to us, however, that many of the facts are essentially undisputed.

Turning now to those facts, we will say, first, that DKQ is a licensed broker-dealer in securities and is a member of the New York Stock Exchange and of the National Association of Security Dealers. The defendant, Ware, is listed with the New York Stock Exchange as a "registered principal." The Champion stock with which we are concerned was a duly registered security. In those circumstances, DKQ and Ware were, of course, subject to the statutes, rules and regulations that have been mentioned. No claim is made that in his dealings with the plaintiff Ware was acting otherwise than in the course and scope of his employment as DKQ's managing agent in Lincoln.

The plaintiff, Dr. Daniel L. Shull, is a practicing chiropractor and is apparently a successful one. He and his wife moved to Lincoln in 1967 and acquired a substantial home which was well furnished. Their life style was calculated to create the impression that they were people of substantial means. Prior to moving to Lincoln, Dr. Shull had lived in Colorado and perhaps in Kansas.

For a number of years prior to the period involved in this case plaintiff and his wife had habitually invested in corporate stocks, including some rather highly speculative ones. For a substantial period of time they dealt with a stock broker in Salt Lake City; he had no real knowledge of their financial status but gained the impression that they were wealthy people and could afford to play the market. It appears that plaintiff and Mrs. Shull placed substantial sums in the hands of that broker for investment. Plaintiff claims, however, that until be began to deal with Mr. Ware he had never bought any stocks on margin, and the district court found that in 1972 and 1973 plaintiff was actually what is commonly called an "unsophisticated investor." Plaintiff was introduced to Ware by a patient in 1967.

Thereafter plaintiff began to buy and sell stocks through Ware although plaintiff still maintained his relations with the Salt Lake broker for some years. Ware was told that plaintiff and his wife desired to make money out of their stock purchases, that they wanted Ware to handle their business, and that he should deal with their money as though it were his own. Ware never undertook to make any detailed investigation of plaintiff's financial situation; however, he visited in plaintiff's home and was aware of

certain other assets owned by plaintiff. Like the broker in Salt Lake City, Ware seems to have assumed that plaintiff was a wealthy man and could afford to be in the market. At no time did the plaintiff do or say anything to dispel that belief.

In October, 1968 plaintiff joined an investment club that had been formed by Ware and of which Ware was the elected secretary. The name of this club was Pacesetters No. 2; it was succeeded by Pacesetters No. 3, and still later by Pacesetters No. 4. The club had eight members who met once a month. At each meeting each member would contribute $50.00 to a pool, and stocks would be bought in accordance with the wishes of a majority of the members. At the meetings various stocks would be discussed, and individual members would give reports on particular stocks.

In 1971 Pacesetters No. 2 and Ware personally began to invest in Champion stock in which Ware had great confidence. During 1972 Ware both bought and sold the stock for his own account and usually had between $25,000.00 and $30,000.00 of his own money invested in it.

The record reflects that DKQ maintained a research service that followed and recommended certain stocks to customers. That service never followed or recommended Champion stock. However, not much importance is to be attached to that fact in itself.

There is no doubt that during 1972 Ware was pushing the stock in question and was making certain representations about his knowledge of the affairs of the issuing company which were not altogether true. For example, he stated that he was personally acquainted with some of the officers of the company which was not the case.

The district court found, and the record reflects, that plaintiff on Ware's recommendation began to buy and sell Champion stock in 1972. Purchases made by plaintiff between late January and early June appear to have been for cash.

During the seven months period from January 28 to July 28, 1972 the price of the stock rose sharply from $41.00 per share to $125.75 per share on June 3; as of July 28 it was down to $109.50. Shull and Ware knew that the stock was to be split five-for-one on July 31 and hoped that the split would increase the price of the stock. It did not do so, and the price declined steadily and rapidly throughout the rest of 1972 and into 1973.

Plaintiff began to purchase Champion stock on margin in June 1972 and continued to do so for the rest of the year. Plaintiff also bought Champion stock for cash in 1973; the 1973 purchases were not on the recommendation of Ware. Plaintiff made his last purchase of Champion stock on June 4, 1973 and paid $5.25 per share for it.

As stated, during 1972 Ware both bought and sold Champion stock for his own account. In early 1973 he bought a substantial number of shares and sold none during that year.

Plaintiff financed his 1972 margin transactions largely by means of bank loans. His first loan in the sum of $20,000 was made in June, 1972 by the Nehawka Bank of Nehawka, Nebraska; he also borrowed from the First National Bank & Trust Company, the National Bank of Commerce and Citibank & Trust Co., all of Lincoln, and he made a loan from the Martell State Bank of Martell, Nebraska. The proceeds of those loans were used to make down payments on margin stocks and to meet margin calls as the price of Champion stock fell. Whether Ware "arranged" those loans in violation of Regulation "T" is an important issue in the case.

As has been seen, plaintiff's complaint set out a number of bases of recovery, a principal one of which was that in inducing plaintiff to buy Champion stock on margin Ware had been guilty of what may generally be called "fraud," that is to say, that Ware had intentionally made misstatements of material facts and had failed to disclose material facts that he ought to have disclosed. And

Counts I, II, III, IV, IX and XI were ultimately based on fraud.[2]

Plaintiff claimed that Ware urged and induced plaintiff to buy the stock without adequately looking into questions of plaintiff's situation and needs and without adequately investigating the issuing company. Plaintiff also claimed that Ware made some positive misrepresentations and was guilty of certain nondisclosures, namely, that Ware told plaintiff that Ware was buying large blocks of Champion stock in approximately the same amounts as those he was recommending to the plaintiff; that Ware had inside information about the affairs and organization of the issuing company; that it was a legal and common practice for individuals situated as was plaintiff to borrow money to buy stocks on margin, and that Ware was doing the same thing himself; and that when the price of the stock began to decline, Ware represented that he was losing large amounts of money and that he was borrowing from banks and mortgaging his assets in order to hold the stock. Other claims were that Ware failed to disclose to plaintiff and other members of the investment club that DKQ was not following the stock and had not recommended it to its customers, and that Ware did not disclose to plaintiff in 1972 that Ware was selling Champion stock as well as buying it for his own account.

The district court discussed the subject of fraud in some detail in its general consideration of the facts of the case and mentioned it in connection with certain particular counts.

■ The district court found ultimately that while Ware may have been negligent and while he may have been overenthusiastic in his endorsement and recommendation of Champion stock in 1972 if not in 1973, he had not acted dishonestly or with any fraudulent, deceptive or manipulative intent, and that the plaintiff had not carried his burden of proof on the fraud issues.

In fairness to the plaintiff we will say that the evidence did not require the district court to resolve the fraud issues adversely to plaintiff, and that the decision might well have gone the other way. We are not able to say, however, that the findings of the district court were not supported by substantial evidence or that they were clearly erroneous.

The district court's finding that no fraud or scienter had been proved by a preponderance of the evidence was dispositive of Count IV and of Count XI, and nothing further need be said about those counts. Some discussion as to the remaining counts is necessary.

■ As to Count I the district court concluded that assuming that Ware had made false statements or had failed to make proper disclosures, plaintiff was aware of the true facts or should have been aware of them substantially more than a year prior to the filing of the suit, and that Count I was barred by the one year limitations period set out in § 13 of the 1933 Act, 15 U.S.C. § 77m. As to Count IX, which was based on the Nebraska Securities Act, the district court found that plaintiff's last purchase of the Champion stock had been made more than two years prior to the filing of the suit, and that Count IX was barred by limitations. We are of the opinion that the factual findings underlying the dispositions of those counts were not clearly erroneous, and that no error was committed when those counts were dismissed.

■ Count II was dismissed on the ground that § 17(a) of the Act gives no private cause of action. We agree. *Greater Iowa Corp. v. McLendon, supra.*

■ Count III went out because there was no evidence that the conduct or representations of Ware had affected the price of Champion stock in any way. Again we agree.

■ We will pass over Count V for a moment and turn our attention to Counts

---

**2.** It will be recalled that Count V was based on alleged violations of Regulation "T," and Counts VI, VII and VIII were based on alleged

violations of Stock Exchange and Association Rules.

VI, VII and VIII based on the violations of the Rules of the New York Stock Exchange and of the National Association of Security Dealers. For purposes of discussion we will assume that DKQ and Ware in fact violated all three of the Rules invoked by plaintiff.

The question of whether a violation of a private stock exchange or trade association rule, required to be promulgated by federal law, such as a rule of the New York Stock Exchange or the National Association of Security Dealers, gives rise to a private cause of action in favor of a customer or trader who is damaged as a result of the breach is a troublesome one. It was before us recently in the context of an alleged breach of a rule of the Chicago Mercantile Exchange in *Lincoln Commodity Services v. Meade*, 558 F.2d 469 (8th Cir. 1977), and we found that no private cause of action had been established in that case. Speaking of the question generally we said (p. 474, n.1):

> Some courts have suggested such a right of action for violations of securities exchange rules. *Colonial Realty Corp. v. Bache & Co.*, 358 F.2d 178 (2d Cir.), *cert. denied*, 385 U.S. 817 [87 S.Ct. 40, 17 L.Ed.2d 56] (1966); *Buttrey v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 410 F.2d 135, 141 (7th Cir.), *cert. denied*, 396 U.S. 838 [90 S.Ct. 98, 24 L.Ed.2d 88] (1969). It has been argued that the same sort of right ought to be available where there are violations of the rules of contract markets upon which commodities are traded. *See, e. g.*, Note, Private Rights of Action for Commodity Futures Investors, 55 B.U.L.Rev. 804–26 (1975). However, courts have not usually recognized a private right of action for violations of exchange rules in the absence of a finding of fraud. *See, e. g.*, *Carras v. Burns*, 516 F.2d 251, 260 (4th Cir. 1975); *Evans v. Kerbs & Co.*, 411 F.Supp. 616, 624 (S.D.N.Y.1976). In the instant case there was no finding of fraud.

Since the district court permissibly found that plaintiff had failed to prove fraud on the part of the defendants, we conclude that no error was committed when Counts VI, VII and VIII were dismissed.

There remains for consideration the question of the propriety of the action of the district court in dismissing Count V of the complaint which alleged violations by Ware of Regulation "T" of the Federal Reserve Board, upon which regulation we have commented to some extent already.

The plaintiff contends that the loans that he obtained from banks in 1972 were made in violation of Regulation "U," and that Ware had "arranged" them in violation of Regulation "T." The defendants contend that the loans involved no violations of Regulation "T" by Ware, and that in any event Ware did not "arrange" for the loans to be made to the plaintiff.

The trial judge found that Ware had not arranged the loans and evidently considered it unnecessary to decide whether the credit extensions involved violations of Regulation "T" or Regulation "U," or both. For purposes of discussion we will assume that the loans were illegal, and will confine ourselves to the question of whether Ware "arranged" for the loans to be made and so violated Regulation "T."

Neither the 1934 statute nor the regulations of the Federal Reserve Board defines the term "arrange for the extension or maintenance of credit" or the terms "arrangement" or "arranging." It is obvious that a broker may be involved in various ways and to various extents in a loan made by a third person, including a bank, to one of the broker's customers, and it may not always be easy to determine whether in a particular case the broker "arranged" the loan and so violated the Regulation.

Either one of two extreme views can be taken. It can be argued that a broker has arranged for an extension of credit to his customer if the former has participated in the credit transaction in any way. On the other hand, it can be urged that a broker has not arranged a loan or extension of credit unless he was the procuring cause of it, or unless but for the efforts of the broker the loan would not have been made.

Both of those views were pressed upon the court in *Alaska Interstate Co. v. McMil-*

*lian*, 402 F.Supp. 532, 553–58 (D.Del.1975), a case which counsel for plaintiff has earnestly recommended to our attention. After taking note of the existence of the two extreme views and after observing that it thought that the "but for" view was "closer to the mark," the district court found itself unable to accept either view. 402 F.Supp. at 554. After discussing the problem, the court seems to have come to the conclusion that the question of whether an extension of credit had been "arranged" by a broker or dealer depends for its answer "on the degree of the broker's participation and its propensity to cause an extension of credit in a situation where credit might not otherwise be extended." 402 F.Supp. at 555. The court felt that an "arranging" would be shown if it appeared that the broker had initiated the contact between the customer and the lender or had participated in the loan negotiations, but that a "less direct involvement without some further causal relationship" would not suffice. 402 F.Supp. at 556. And it seems to us that regardless of the standard to be employed the question in each case is ultimately one of fact.

We have carefully considered the evidence in the case bearing on this particular issue mindful that the burden was on the plaintiff to establish by a preponderance of the evidence that Ware arranged the respective loans, that plaintiff was not entitled to have his testimony taken at face value and was not necessarily entitled to have the evidence viewed in the light most favorable to him.

There is no evidence that Ware participated in the negotiations of any of the several loans that were made to plaintiff, and there is no satisfactory evidence that the loans would not have been made "but for" participation by Ware in the over-all transactions. As to whether Ware initiated the contacts between plaintiff and the respective banks, assuming that such initiation would constitute an "arranging," the case is much closer, and the first loan to plaintiff which was made by the Nehawka Bank is particularly suspect since it seems clear that Ware drove plaintiff to that bank in Ware's automobile and introduced plaintiff to the bank official who made the loan. And there was evidence on the part of the plaintiff to the effect that with respect to the other bank loans Ware indicated to plaintiff the banks upon which he should call, and that on one occasion a bank officer telephoned Ware to express appreciation for having been sent plaintiff's business.

On this phase of the case the trial judge found that Ware knew that plaintiff was borrowing money to buy stock, and that Ware took plaintiff to the Nehawka Bank in June, 1972 "in order that Shull might borrow from that bank." However, that statement in the opinion is followed immediately by this one: "Nevertheless, none of these loans was arranged by Ware. He did not make the appointment, he did not encourage the banker to make the loan, and none of the loans was made on the strength of or because of anything Ware did." And in dealing with Count V specifically the district court said: "This claim is not factually supported because the preponderance of the evidence does not establish that Ware arranged for credit within the meaning of the Act."

As in the case of the fraud issues, we think that the decision of the trial court could easily have gone the other way, but we are not prepared to say that the trial court's finding stemmed from an improper view of the law or that it was clearly erroneous.

In view of what has been said, it follows that the judgment of the district court is affirmed.