**William T. SKAR, an Incompetent, by and through his Father and Conservator, Zenon Skar, Appellant,**

**v.**

**The CITY OF LINCOLN, NEBRASKA, a Municipal Corporation, and R. G. Osborne, Appellees.**

No. 78–1048.

United States Court of Appeals, Eighth Circuit.

Submitted Sept. 13, 1978.

Decided May 21, 1979.

254

William A. Wieland, of Healey, Healey, Brown, Wieland & Glynn, Lincoln, Neb., for appellant.

Richard D. Sievers, of Marti, Dalton, Bruckner, O'Gara & Keating, Lincoln, Neb., for appellee, City of Lincoln.

Donald E. Endacott, of Knudsen, Berkheimer, Endacott & Beam, Lincoln, Neb., for appellee, Lincoln General Hospital.

Robert T. Grimit, of Baylor, Evnen, Baylor, Curtiss & Grimit, Lincoln, Neb., for appellee, R. G. Osborne.

Before HEANEY, STEPHENSON, Circuit Judges, and HANSON, Senior District Judge.[*]

HANSON, Senior District Judge.

This case presents an appeal from the judgments of the district court[1] in a tort action arising out of the injuries sustained by William T. Skar when he leaped into a window in the psychiatric ward of Lincoln General Hospital (the hospital) in Lincoln, Nebraska. Skar brought suit against the City of Lincoln in its capacities as operator of the county-city jail, and as operator of the hospital;[2] Midwest Physicians Services, Inc. (Midwest), which operated the emergency room at the hospital; and Dr. Robert Osborne, a psychiatrist who cared for Skar at the hospital. The action was brought under the district court's diversity jurisdiction. The claims against the hospital and jail are permitted by the waiver of immunity found in the Nebraska Political Subdivisions Tort Claims Act, Neb.Rev.Stat. §§ 23–2401 to 23–2420 (Reissue 1977). *See Koepf v. County of York*, 198 Neb. 67, 251 N.W.2d 866, 869 (1977). The substantive law of Nebraska governs.

The claims against the city and Midwest were tried to the court. Dr. Osborne's liability was tried to a jury. The claims against all the defendants were tried in a single trial. At the end of Skar's evidence, the hospital, jail, and Midwest moved for dismissal pursuant to Rule 41(b), F.R.Civ.P. Dr. Osborne moved for a directed verdict. The district court sustained the motions under Rule 41(b) with respect to those claims tried to the court, but overruled the motion for a directed verdict of Dr. Osborne and ultimately submitted his case to the jury. The jury subsequently returned a verdict

for Osborne and judgment was entered thereon. Skar appeals from the district court's findings and conclusions as they relate to the liability of the hospital and jail, and from the judgment entered on the jury's verdict in favor of Dr. Osborne. No appeal is taken from the district court's dismissal of the claim against Midwest.

We affirm.

I.

The underlying facts are substantially undisputed. At 5:50 a. m. on June 3, 1975 Skar was found sleeping and intoxicated in his car on Interstate 80 west of Lincoln, Nebraska by a trooper of the Nebraska State Patrol. The only indication in Skar's possession of an address was 605½ Main, Longmont, Colorado which was, in fact, his correct address. Skar was arrested for public intoxication and about an hour later arrived at the county-city jail in Lincoln where he was placed in a holding room, and later in a small single person cell for intoxicated persons. During the 31 hours Skar spent in the jail his behavior became increasingly unusual. Also during this time he was frequently checked by medical personnel at the jail.

At first Skar was simply uncommunicative. Later, however, at 1:00 p. m. on June 3 the jailer observed Skar banging his head on the cell wall. Early that evening, Skar defecated in various locations on the cell floor, removed his clothes and neatly laid them out on the floor. At 10:30 p. m. he fell when his jailers attempted to fingerprint and photograph him, though he was believed not to then be intoxicated.

At 2:00 a. m. in the morning of June 4 Skar sought to make a telephone call but when permitted to do so simply mouthed words into the receiver without speaking. A jail nurse made a notation in the medical record after the 2:00 a. m. incident that

* The Honorable William C. Hanson, Senior District Judge, Southern District of Iowa, sitting by designation.

1. The Honorable Warren K. Urbom, Chief District Judge, District of Nebraska.

2. These entities were represented by separate counsel in the district court, and are so represented in this court as well.

Skar could be "acting out," or might be "mental." Later, at approximately 8:00 a. m., Skar was observed staring blankly into space with tears in his eyes. He remained uncommunicative, mumbling incoherently and "doing yoga." At 9:30 a. m. Skar pounded on his cell door and again took off all of his clothing.

By 10:00 a. m. the jail nurse decided to and did contact a doctor who regularly made calls at the jail. The doctor prescribed medication and directed steps to gain Skar's admittance to the Lincoln Regional Center, a state mental hospital. The nurse thereupon signed an affidavit asserting her belief that Skar was mentally ill and initiating a process leading to a hearing before a board of mental health scheduled the following day. The Lincoln Regional Center could not accommodate Skar and at 2:00 p. m. on June 4 he was transported instead to Lincoln General Hospital.

As noted, the emergency room at the hospital was operated by Midwest Physicians Services, Inc. Dr. Harris Graves, an officer of Midwest, examined and took a history from Skar, aided in part by a brief oral summary of Skar's post-arrest behavior provided by the jail. Dr. Graves recorded his findings as follows:

PHYSICAL FINDINGS: Pt. refused to speak here & only cried. After a time became awake & said would like to help anyway he could but that 'love' got him in trouble. He is on his way from Illinois to either Venus or Mars. Healing burn rt. arm. Excoriations of lower legs. Multiple abrasions. Says has smoked pot but on no other drugs.

DIAGNOSIS: Paranoid Schizophrenia.

After initial processing in the emergency room, Skar was admitted to the psychiatric ward on the hospital's third floor and placed in room 321. The room next to 321, room 320, was a security room which could be locked and was barren of such items as drapery cords, electrical outlets, television or telephone—items with which a patient could injure himself. Skar's room, however, had these amenities. Both rooms had reinforced windows.

At 4:00 p. m. on June 4 Dr. Osborne examined Skar for the first time. Skar refused to respond initially, but after some 45 minutes began to provide limited information. On Dr. Osborne's inquiry, Skar denied having been hospitalized for mental illness and denied any suicidal inclinations. Skar indicated he was enroute to Colorado but refused to discuss his family or marital status, or to provide sufficient information which would have enabled Dr. Osborne to contact Skar's parents. Skar's parents could have provided important information about Skar's past marital difficulties and associated mental problems. In addition, Skar stated he had been drinking heavily, had diabetes and had received a discharge from the Navy for that reason, and thought he was in Dubuque, Iowa. Most of the factual information provided to Dr. Osborne by Skar was untrue, including his assertion that he had never been hospitalized for mental illness. In 1974 Skar had been hospitalized in Illinois where he was diagnosed as a schizophrenic. Dr. Osborne noted that Skar appeared disoriented and was possibly acting, concluding with the diagnosis: "(1) Drug overdose or alcohol intoxication and withdrawal. (2) ? Possible Psychosis."

Subsequent to Dr. Osborne's examination Skar continued to manifest peculiar though pacific behavior. For the most part, he remained nonresponsive; however, when a nurse accused him of acting, Skar smiled and stated that he was from St. Charles, Illinois before relapsing into silence. This information was entered in the nurses' notes. Shortly thereafter, at 7:30 p. m. on June 4, Dr. Osborne was notified via telephone by a psychiatric ward nurse of the results of chemical tests previously ordered on Skar. He was not told that Skar claimed to be from St. Charles, nor was he brought up to date on Skar's behavior in the ward subsequent to Osborne's examination. In fact, Skar had been raised in St. Charles, his parents resided there and could have been contacted prior to the injury; and St. Charles was closely associated with deep marital and emotional problems in Skar's past. Knowledge of the nature and

extent of these problems would have aided in completing an accurate history on Skar, and together with his record of prior hospitalization, would have indicated some possibility of self-destructive behavior.

When contacted at 7:30 p. m., Dr. Osborne ordered a chest x-ray for Skar, and directed that hospital personnel should "[r]estrain or seclude P.R.N." "P.R.N. is jargon for "as necessary."

The nurses' notes reflect that Skar remained awake until 11:00 p. m. During this time he was quiet but remained uncommunicative. At 2:00 a. m. on June 5 Skar awoke, got dressed, and walked toward the elevators on the third floor. He was returned to the ward by a nurse without difficulty. Skar apparently remained awake until approximately 5:30 a. m. During that time he mouthed words without speaking, engaged in other peculiar, non-threatening behavior, cried and said he missed his wife and daughter.[3] At 5:30 Skar went to bed but got up a short time later and went into the lounge. From the vicinity of the nurses' station Skar began to walk toward his room accompanied by nurse Lorraine Stoklasa. Upon nearing his room Skar suddenly broke into a run, nurse Stoklasa pursuing him. Skar turned into his room and, still running, apparently attempted to leap out of the reinforced window.[4] He hit the window and fell back to the floor. As a result of the impact, Skar suffered a disabling injury to his spine.

The district court made the required findings and conclusions with respect to the claims against the jail and the hospital. In the case of the former, the district court found that jail nurses were negligent in failing to recognize signs of Skar's mental disturbance within a reasonable time after his incarceration and further, in failing to immediately seek treatment for Skar when they were alerted to his mental conditions.

Specifically, the district court concluded that the nurse or nurses at the jail should have been aware of the need for medical care and taken action to secure it by 9:00 a. m. on June 4, an hour earlier than the doctor was actually called. However, the court found that the negligent omission was too speculative and remote to have been a cause of Skar's injury.

With regard to the hospital, the district court found evidence of three potentially negligent omissions "(1) Failure to move William Skar to a secluded room with one-on-one observation; (2) Failure to report to R. G. Osborne information obtained by observing William Skar; (3) Failure to attempt to contact the next of kin of William Skar." All other specifications of negligence were rejected and are not renewed on appeal. The district court concluded, however, that the evidence was not sufficient to warrant finding a breach of the duty of reasonable care with regard to the nurses' failure to seclude Skar as they were authorized to do by Dr. Osobrne's directions, or their failure to attempt to contact Skar's next of kin, a task the district court determined was primarily the duty of the attending physician. With respect to the failure of hospital personnel to report information obtained by observing Skar (including the fact that Skar claimed to be from St. Charles), the district court stated: "In the absence of any further evidence on behalf of the hospital . . . I would probably find that the nursing staff was negligent. . . ." However, assuming the existence of a negligent omission, the district court held that the failure to report observations to Dr. Osborne was not a proximate cause or proximately contributing cause of Skar's injuries.

Lastly, the district court overruled the motion for a directed verdict and ultimately submitted the case against Dr. Osborne to the jury. In so doing, and over Skar's

---

**3.** Skar's marriage ended in divorce in 1973 and Skar thereafter moved to Colorado. His presence in Lincoln in early June 1975 as well, perhaps, as his psychotic condition, can be explained by the fact that in late May Skar returned home to St. Charles to attend a non-sup-

port hearing and learned that his former wife had remarried. Skar thereupon became unstable and moody, and departed for Colorado.

**4.** Skar ran a total of 20–25 feet from the point he began running until stopped by the window.

objection, the court instructed the jury on contributory negligence as it related to Skar's alleged failure to provide truthful and complete information about himself to the defendants.

We address the two issues raised by Skar dispositive of this appeal: (1) whether the district court erred in concluding that the negligence of the jail and hospital was not a proximate cause or proximately contributing cause of Skar's injury; and (2) whether the district court erred in submitting contributory negligence to the jury with regard to the claims against Dr. Osborne.

## II.

*Causation*

▮ The element of causation is ordinarily a question of fact. *See* W. Prosser, Law of Torts § 45, at 290 (4th ed. 1971); *see generally Hosford v. Doherty*, 198 Neb. 211, 252 N.W.2d 154, 156 (1977). In view of the fact that the claims against the jail and hospital were tried to the court rather than the jury, we will not disturb the district court's factual findings made in ruling on motions under Rule 41(b), F.R.Civ.P. unless clearly erroneous. *See Shull v. Dain, Kalman & Quail, Inc.*, 561 F.2d 152, 154–55 (8th Cir. 1977), *cert. denied*, 434 U.S. 1086, 98 S.Ct. 1281, 55 L.Ed.2d 792 (1978); *Lang v. Cone*, 542 F.2d 751, 754 (8th Cir. 1976). Our review of the record convinces us that the district court's findings on the element of causation are not clearly erroneous. *See generally Southern Illinois Stone Company v. Universal Engineering Corp.*, 592 F.2d 446 at 451 (8th Cir. 1979).

▮ We turn to the hospital first as the site of the injury. Initially, Skar asserts that, contrary to the district court's findings, the evidence shows that hospital personnel were also negligent in failing to place Skar in a secluded room with one-on-one observation and in failing to attempt to contact Skar's next of kin. The district court's findings are not clearly erroneous and, indeed, it is of little consequence in which of the three respects alleged the hospital deviated from the local standard of high quality care.[5] If hospital personnel had relayed complete information to Dr. Osborne and attempted to contact next of kin to ascertain biographical data, a decision might have been made by Dr. Osborne to change Skar's conditions of hospitalization to require seclusion in his room or room 320 with one-on-one observation. Skar does not appear to argue, nor does the evidence show, that the applicable standard of care during the evening and morning of June 4–5, 1975 would have required anything more by way of treatment and observation than placement "in a seclusion room, without necessarily locking the door, but having a nurse's aide or a nurse sit and watch him in fairly close contact, outside the door, near the patient, and attempt to establish contact with the patient." Appellant's Brief at 23. Skar's quiet and generally peaceful behavior at the hospital and jail would not, therefore, have warranted physical restraints.[6]

Thus, as a practical matter, it may be assumed for the purposes of examining cau-

---

**5.** The standard of care owed by a hospital in Nebraska has recently been summarized by this Court:

> [A] hospital must exercise the degree of care, skill, and diligence generally followed by hospitals in the community or in similar communities. *See Foley v. Bishop Clarkson Memorial Hospital*, 185 Neb. 89, 93, 173 N.W.2d 881, 884 (1970). The hospital is obligated not only to guard against a patient's known physical and mental conditions "but also against such conditions . . . it should have discovered by the exercise of reasonable care." *Id. See also Wees v. Creighton Memorial St. Joseph's Hospital*, 194 Neb. 295, 231 N.W.2d 570, 573 (1975).

*Northrup v. Archbishop Bergan Mercy Hospital*, 575 F.2d 605, 608 (8th Cir. 1978). Dr. Ruben, Skar's expert, testified that the applicable degree of care was that of high quality care.

**6.** As the parties have noted, modern psychiatric practice favors the least restrictive alternative in protecting psychiatric patients from potential self-harm. The standard of care owed by the hospital would not require otherwise here. *See, e. g., Dinnerstein v. United States*, 486 F.2d 34, 38 (2nd Cir. 1973); *Voss v. United States*, 423 F.Supp. 751, 752–53 (E.D.Mo.1976); *Baker v. United States*, 226 F.Supp. 129, 132 (S.D.Iowa 1964), *aff'd* 343 F.2d 222 (8th Cir. 1965).

sation that but for the failure to transmit behavioral and biographical information to Dr. Osborne, Skar might have been placed in the seclusion room, room 320, with a nurse constantly observing him from in or outside the room. The district court held that the evidence was insufficient to establish by a preponderance of the evidence that if Skar had been secluded under these conditions his leap into the window, or the resultant injury, would not have occurred. On the record before us this finding is not clearly erroneous. Observation by hospital personnel per se would not necessarily have prevented the dash toward the window for Skar was being observed and accompanied by a nurse in a manner consistent with routine suicide precautions at the time Skar broke into a run. Nor is the evidence sufficient to compel the conclusion that confinement in room 320 would have rendered less likely an attempt to leap out of the window in that room with sufficient force to cause Skar's injury. Dr. Stuart Winston, a neurosurgeon, testified only that Skar's spinal injury was consistent with a full-speed run of 20–25 feet and leap headfirst into a window. He did not testify that a run of that length was an important ingredient, or that the injury was substantially less likely to occur if Skar's movement would have been limited to a seclusion room. Dr. Winston's testimony was at best inconclusive on the relationship between Skar's presence outside his room and the injury, and indeed, established no more than that a significant force was required to produce Skar's injury. Skar has directed us to no other compelling evidence relevant to the relationship between seclusion in a room and the likelihood of Skar's self-destructive behavior and injury. Accordingly, there is no basis for holding that as a fact finder the district court clearly erred in finding that Skar had not proved by a preponderance of the evidence that the failure of the hospital nurses to provide Dr. Osborne with complete information concerning Skar's behavior prior to his injury was a proximate or proximately contributing cause of the injury. *Cf. Voegeli v. Lewis*, 568 F.2d 89, 94 (8th Cir. 1977).

With respect to the actions of jail personnel, Skar asserts that the period of tardiness was longer than the one hour found by the district court, and instead was 8 to 11 hours. There is some force to Skar's argument to the extent he argues that in the exercise of a high degree of care to protect a prisoner who does not appear to be in control of his mental faculties, a doctor should have been consulted earlier in the morning of June 4 within a reasonable time after a jail nurse noted that Skar might be "mental," rather than later at 10:00 a. m. when the doctor was actually called, or at 9:00 a. m. as the district court found. *See Daniels v. Andersen*, 195 Neb. 95, 237 N.W.2d 397, 401 (1975). However, any deficiency in the district court's findings as to the extent of the jail's negligence does not necessitate a different result on the element of causation.

Skar's theory of causation is that the negligently long period of incarceration without attention to his apparent mental disorder aggravated a pre-existing and then-existing schizophrenic condition, which in turn contributed to his subsequent leap at the window. Dr. Harvey Ruben, a psychiatrist who appeared as an expert witness for Skar, testified that incarceration in the jail was one of the constellation of factors that potentiated Skar's leap into the window. The district court appeared to give little weight to this aspect of Ruben's testimony, however, though it credited Dr. Ruben with respect to the applicable degree of care for a hospital. Generally, a fact finder may give properly admitted expert testimony such weight as he or she thinks the circumstances dictate that it deserves. *See Singer v. E. I. duPont deNemours & Co.*, 579 F.2d 433, 442–43 (8th Cir. 1978). Here Dr. Ruben's own testimony contains ample reason to reject a theory of causation predicated on aggravation of schizophrenia by over-long incarceration in jail without a doctor's care. Dr. Ruben also testified, in essence, that one or more factors resulted in Skar's decision to leap at the window, and that it was not possible to identify exactly what these were or which factor or factors affected his decision. It is evident the dis-

trict court could have concluded from Dr. Ruben's testimony that Skar's unnecessarily prolonged incarceration in the jail may or may not have been a substantial factor in Skar's leap into the window. Thus the district court did not clearly err in concluding that the causal connection was "speculative and remote." *See generally Mustion v. Ealy*, 201 Neb. 139, 266 N.W.2d 730, 734 (1978); *Pendleton Woolen Mills v. Vending Associates, Inc.*, 195 Neb. 46, 237 N.W.2d 99, 102–03 (1975). Moreover, we are not convinced that in the circumstances of this case the Supreme Court of Nebraska, which has defined an element of proximate cause in terms of the natural and probable result of negligent acts and omissions, would conclude that Skar's post-incarceration, self-destructive behavior was a foreseeable result of the jail's failure to more promptly seek a doctor's advice. *See Daniels v. Andersen*, 237 N.W.2d at 402; *see also Bringewatt v. Mueller*, 201 Neb. 736, 272 N.W.2d 37, 39 (1978).

*Contributory Negligence*

The case against Dr. Osborne was, as noted, submitted to a jury. Also submitted was an instruction on contributory negligence. The contributorily negligent acts presented for the jury's deliberation were Skar's alleged failure to give information requested of him by the defendants, and the giving of allegedly false, incomplete and misleading information. Skar's principal complaint is that Dr. Osborne did not generate a submissible issue on contributory negligence.[7]

It is settled under Nebraska law that contributory negligence is a valid defense in a medical malpractice case. *See Mecham v. McLeay*, 193 Neb. 457, 227 N.W.2d 829, 833 (1975). *Mecham* also establishes that a patient has a duty to cooperate with a treating physician, at least to the extent he is

able. *Id.* at 833–34. If the jury believed Skar's contention that a proximate cause of his injuries was the failure of Dr. Osborne to take appropriate precautions against self-destructive behavior, Dr. Osborne was entitled to show that such failure was contributorily caused by materially false and incomplete information furnished by Skar. Inasmuch as the theory of Skar's case depended heavily on the premise that accurate factual information about his history and behavior was essential to his psychiatric care, Skar invited an affirmative defense that he failed to cooperate in his treatment by providing such information within his own knowledge.

In determining whether an issue should be submitted to the jury, this Court and the trial court are constrained to view the evidence in the light most favorable to the party asserting the issue, and to rule against its submission only if reasonable minds must find for the opposing party. *See Northrup v. Archbishop Bergan Mercy Hospital*, 575 F.2d 605, 607 (8th Cir. 1978); *Boyle v. Simon*, 558 F.2d 896, 897 (8th Cir. 1977). Here reasonable persons could differ on the question of whether Skar failed to give the requisite measure of cooperation to Dr. Osborne as his treating physician.

Both Dr. Ruben and Dr. Osborne testified to the importance in diagnosing and treating a patient such as Skar of obtaining information from which to formulate an accurate history, and Skar's own evidence was directed at establishing the causal relationship between the lack of adequate information and his injury. The record contains sufficient evidence from which the jury could find that Skar gave materially false and misleading information about himself, and failed to give virtually any truthful information about his medical history, family history and next of kin when requested to do so. Moreover, from the

7. Skar also maintains that in its instructions the district court erroneously referred to "defendants" generally instead of tailoring its instructions to an alleged failure to provide Dr. Osborne with information. Skar's position here is without merit for two reasons. First, hospital personnel and Midwest had a duty to seek historical information from Skar and report it to his physician, and second, many of the important alleged falsehoods and omissions occurred during Osborne's examination of Skar with the result that error, if any, was not prejudicial.

testimony of Dr. Osborne and from the evidence as to Skar's behavior at both the jail and the hospital, the jury could have found that Skar was capable of providing full and complete information about himself.[8]

In view of our conclusion that as a fact finder the district court made findings that were not clearly erroneous, and that contributory negligence was properly submitted to the jury in the case against Dr. Osborne,[9] the judgments appealed from will be affirmed.

Affirmed.

HEANEY, Circuit Judge, concurring.

I concur. I agree that the District Court was not clearly erroneous in finding that the negligence of the jail and hospital was not the proximate cause of Skar's injury for the reasons stated in Judge Hanson's opinion. Although I also agree that the issue of contributory negligence was properly submitted to the jury, I feel that it is necessary to expand upon the majority's analysis.

Under Nebraska law, a patient has the duty to fully and truthfully answer questions that are asked by his physician to form a diagnosis, but only if he has the physical and mental ability to do so. Consequently, an instruction on contributory negligence should not be given if a patient is unable to provide complete and accurate information about himself because of a mental condition.

As the majority recognizes, an issue should be submitted to the jury only if reasonable minds could differ on its resolution. During the trial, evidence was introduced indicating that Skar was incapable of accurately informing his physician. Skar was diagnosed by one physician as a paranoid schizophrenic. One manifestation of paranoid schizophrenia is the inability to discern truth from fantasy. Other evidence, however, indicates that Skar's men-

tal capacity to provide this information was not substantially impaired. Dr. Osborne concluded that Skar was in control of his faculties and was merely refusing to cooperate. None of the subsequent psychiatric and psychological evaluations Skar underwent indicated a paranoid schizophrenic condition. Insofar as there is considerable conflict in the record concerning Skar's ability to provide full and accurate information about himself, it was for the jury to decide whether Skar had a duty to do so; and if so, whether he breached that duty. Thus, on the basis of this record, including the medical testimony, I conclude that the District Court did not err in submitting the issue of contributory negligence to the jury, although I have grave reservations whether such testimony reflects the true state of events.

Accordingly, I concur in the affirmance.

---

8. Dr. Osborne testified that his impression was that Skar could have given him more information than he did and voluntarily chose not to.

9. Thus we have no occasion to decide the argument presented by Dr. Osborne that any error in the instructions was not prejudicial because he was entitled to judgment on his motion for a directed verdict.