Charles SAFFO, Richard Kavner and Harold J. Gibbons, Appellees,

v.

OCCIDENTAL LIFE INSURANCE COMPANY OF CALIFORNIA, a Corporation.

Appeal of LHI–688 EMPLOYEES RETIREMENT AND PENSION PLAN TRUST, Philip L. Goodwilling, Levi Sanford, Ernst Neidell, Paul Akers, Ronald Gamache, Michael Dunn, Kenneth Carroll, James Joiner, Chick Thornton, and John Becker (two cases).

Charles SAFFO, Richard Kavner and Harold J. Gibbons, Appellees,

v.

OCCIDENTAL LIFE INSURANCE COMPANY OF CALIFORNIA, a Corporation, Appellant.

Nos. 78–1634, 78–1638.

United States Court of Appeals, Eighth Circuit.

Submitted Feb. 14, 1979.

Decided June 1, 1979.

Rehearing Denied July 9, 1979.

Clyde E. Craig of Wiley, Craig Armbruster, Wilburn & Mills, St. Louis, Mo., argued, for LHI and on brief, for other appellants.

Ilbert Phillips of American Council for Life Insurance, Los Angeles, Cal., argued and on brief, for Occidental.

Edward K. Fehlig of Ziercher, Hocker, Tzinberg, Human & Michenfelder, Clayton, Mo., on brief, for Occidental.

Norman W. Armbruster, St. Louis, Mo., on brief, for other appellants.

Alan G. Kimbrell of Rosecan, Shostak, Kimbrell & Witzel, St. Louis, Mo. (argued), and Mortimer A. Rosecan, St. Louis, Mo., on brief, for appellees.

Before HEANEY and McMILLIAN, Circuit Judges, and BENSON,* Chief Judge.

HEANEY, Circuit Judge.

Charles Saffo, Richard Kavner and Harold J. Gibbons, retired beneficiaries of the LHI–688 Employees Retirement and Pension Plan Trust, brought this action against the trustees of the Plan, the officers of Teamsters Local Union No. 688,[1] and Occidental Life Insurance Company of California, alleging that their pension benefits were unlawfully curtailed or terminated. After a nonjury trial, the trial court found in favor of the appellees on the substantive issues. It reserved entry of a monetary award pending further consideration. On appeal, the trustees of the Plan, the officers of Local 688 and Occidental argue that the trial court erred in its interpretation of the Plan documents and that several of its factual findings are clearly erroneous. For the reasons outlined below, we affirm in part, reverse in part and remand for further proceedings.

## I.

### Factual History

In 1968, Harold Gibbons directed Richard Kavner to develop a joint pension program

---

* PAUL BENSON, Chief Judge, United States District Court for the District of North Dakota, sitting by designation.

1. The officers of Local 688 were sued as class representatives of the Union membership. Local 688 is affiliated with the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America.

for Local 688 and the St. Louis Labor Health Institute (LHI). LHI is a nonprofit organization providing medical benefits to union members and is supported by a number of Teamsters' locals, including Local 688. It was established under Gibbons' leadership. During the period that the pension program was under development, Gibbons was Secretary-Treasurer and Chief Executive Officer of Local 688. Kavner, Gibbons' assistant, was supervisor of fringe benefits. LHI and Local 688 subsequently adopted an Agreement and Declaration of Trust which established the LHI–688 Employees Retirement and Pension Plan, effective January 1, 1968.[2] Under the provisions of the agreement, the trustees agreed to administer, under a single trust, contributions made on behalf of LHI and Local 688 employees. The agreement, however, contemplated that there would be two separate pension plans—Plan A for LHI employees and Plan B for Local 688 employees.[3] In separate determination letters, the Internal Revenue Service (IRS) held that each plan was a qualified plan under 26 U.S.C. § 401(a), and that the trust was exempt from the federal income tax under 26 U.S.C. § 501(a). From the adoption of the trust and plans in 1968 until March, 1971, the trustees administered the plans on a self-insured basis.

In late 1969 or early 1970, Kavner, at Gibbons' request, entered into negotiations with Occidental to provide increased benefits for employees of Local 688, and to have Occidental "guarantee" the pension benefits of persons then employed by Local 688. After extensive negotiations, Occidental proposed a group annuity contract which provided that employees of Local 688 who met Plan B's eligibility requirements would be entitled to a monthly pension equal to $40 multiplied by the number of years of their credited service, as defined by the plan, up to a maximum of thirty years. Under the original Plan B, an employee

received benefits equal to $300 per month for a period of sixty months after retirement and $110 per month thereafter. Occidental also agreed to "guarantee" the benefits of Local 688 employees employed at the time the contract was executed. These individuals were listed on Exhibit B to the contract along with their service date and birth date. The guarantee, § 3.7 of the contract, provides:

If the conditions of the Contract are met, or if Discontinuance of the Contract occurs after the conditions of the Contract have been met for the first twenty-five Contract Years, Occidental agrees to provide and guarantee all benefits which shall become payable under the Plan with respect to those Participants who are listed in the Schedule of Participants attached to the Contract as Exhibit B. For the purposes of this Section 3.7, and notwithstanding anything contained in the Contract to the contrary, the Contractholder and Occidental agree that the information and data contained in Exhibit B, as such Exhibit appears at the Contract Date, shall be binding and conclusive. Except as specified in this Section 3.7, Occidental shall not be responsible for the sufficiency of the Deposit Fund to provide the benefits specified in the Plan. Occidental shall have no liability except as provided in the Contract.

The Contractholder and Occidental agree to modify or amend the plan or the Contract appropriately, if such action becomes necessary because of any Federal or State law or regulation which becomes effective after the Contract Date, and which imposes any condition, restriction, limitation or requirement on the operation of either the Plan or the Contract or both which, as determined by Mutual Agreement, would be such as to prevent Occidental from continuing its agreement under this Section.

2. The necessary approval was obtained from the Executive Board of Local 688 and the Board of Directors of LHI.

3. Plan A and Plan B were originally separate documents that were incorporated by reference into the Agreement and Declaration of Trust.

Occidental agreed to provide these benefits if Local 688 contributed $40 per week per active participant to the pension plan.[4]

In keeping with the unified administration of the LHI–688 Pension Plan, the group annuity contract also provided for benefits to LHI employees. Full-time LHI employees meeting Plan A's eligibility requirements were entitled to $300 per month for a period of sixty months after retirement and $110 per month thereafter. Part-time LHI employees were entitled to $135 per month for a period of sixty months after retirement and $90 per month thereafter. This was the identical level of benefits provided for in the original Plan A. Occidental did not guarantee these benefits. LHI was required to pay $12 per week for each full-time employee and $6 per week for each part-time employee to Occidental.

The trustees of the LHI–688 Pension Plan executed the group annuity contract on March 18, 1971. On the same day, they adopted amended Plans A and B retroactive to January 1, 1968.[5] Under the amended plans, the funds previously accumulated in the trust were transferred to Occidental. The amended plans were submitted to and approved by the IRS. Both LHI and Local 688 have continued to make the contributions required by the contract to Occidental.

Kavner retired on January 1, 1972, and in accordance with the service date specified in Exhibit B, received a pension of $1,200 per month. Saffo retired on August 3, 1973, and received a pension of $800 per month. Gibbons retired in August, 1973, shortly after he had been replaced as Secretary-Treasurer of Local 688 by Ronald Gamache, at a pension of $1,200 per month.[6]

In the summer of 1973, the trustees decided to adopt amendments to Plan B to correct what they considered as shortcomings in the plan. They sought to increase the break-in-service period, provide for vesting and early retirement and reduce the number of years necessary for normal retirement. To pay for these changes, the trustees initially considered increasing the $40 per week contribution of Local 688 for its employees. They rejected this option because they believed that Local 688 could not afford it. They then decided to reduce monthly pension benefits from $40 per month to $20 per month for each year of credited service.[7] This reduction in monthly benefits was prospective in nature and affected only those individuals who retired after December 31, 1973. Consequently, the monthly benefits of Saffo, Kavner and Gibbons would not have been altered. The trustees incorporated all of these proposed changes into Amendment 2, which they adopted on November 29, 1973. The adoption was made conditional upon IRS approval.

On July 12, 1974, the IRS District Director for St. Louis notified the trustees that Plan B, if modified by Amendment 2, would no longer qualify as a tax-exempt plan. The letter to the trustees provided in relevant part:

> [I]t is our opinion that these changes to your plan constitute a curtailment or "partial termination" within the meaning of I.T.Reg. § 1.401–6(b)(2).
>
> The effect [that] a curtailment or partial termination will have on the qualified status of a plan depends primarily on (1) the existence of a valid business reason for the termination or curtailment consistent with the assumption that the plan from its inception has been a bona fide permanent program for the exclusive benefit of employees in general, and (2)

---

4. The contribution rate was lower during the earlier years of the contract but gradually increased. In 1970, Local 688 was required to contribute $22 per week per active participant; in 1971, $28 per week; in 1972, $34 per week; and in 1973 and thereafter, $40 per week.

5. The two plans, although retaining distinct provisions, were incorporated into a single document.

6. Gibbons was forced to resign from his position as Secretary-Treasurer as a result of serious internal strife among the officers and staff of Local 688.

7. These figures were based upon information supplied by Occidental's actuaries.

compliance with the requirements of Section 401(a) of the Code in other respects from its adoption through curtailment. * * *

In the instant case, the plan was amended in 1970 [sic] to provide for the $40 per month benefit for each year of service, and that in less than 4 years, the benefits were reduced (as were the Normal Cost figures thereunder) without evidence of business necessity. Absent this business necessity, the original assumption that the plan was a bona fide permanent program must be replaced with the presumption that the Union did not intend the plan to be permanent from the time the $40 benefit was first added in 1970 [sic].

It is further noted that 3 of the 4 former employees who retired during this period were Union officers,[8] members of the class in whose favor discrimination is prohibited by Section 401(a)(4) of the Code, and that between January 1, 1970 and January 1, 1974 (prior to the amendment) the unfunded liability had actually increased, indicating that the contributions made during that period were not sufficient enough to meet current years costs, i. e., normal cost plus interest on the unfunded liability. The presumption of permanency is even more difficult to accept in view of these facts.

Accordingly, it is our opinion that the recent amendment to Plan "B" is to be treated as a partial termination, that neither requirement [(1) or (2) above] was met, and that said amendment has adversely affected the prior qualification of the plan.

The trustees appealed this decision to the Commissioner of Internal Revenue, who affirmed the District Director on March 28, 1975.

On April 25, 1975, the trustees revised the service dates of Kavner and Gibbons as they appeared on Exhibit B. The trustees determined that Gibbons and Kavner had impermissibly attempted to claim service dates based upon years of employment with unions that later merged into Local 688 in addition to their years of employment with Local 688. The trustees also determined that Kavner had incurred a break in service, as defined in the LHI–688 Pension Plan, and, consequently, was not eligible to receive any pension benefits. These actions had the effect of retroactively reducing Gibbons' monthly benefit from $1,200 to $960 and of terminating Kavner's $1,200 monthly benefit.

After the IRS rejected Amendment 2, the trustees proposed Amendment 4. Amendment 4 reduced the monthly benefit level for each year of credited service from $40 to $20.55, and reduced the maximum years of service that could be used in computing the monthly benefit from thirty to twenty-five years. The amendment was retroactive in nature and reduced the monthly benefit payments of all previous retirees as of their respective dates of retirement. Gibbons' monthly pension was reduced from $960.00 to $493.20, and Saffo's monthly pension was reduced from $800.00 to $411.00. The trustees submitted the proposed amendment to the IRS for approval.

On August 11, 1975, the IRS approved the amendment. In a letter to the trustees, it stated:

You were previously advised that an unexecuted amendment submitted in 1974 would cause the above-named plan to fail of qualification under Section 401 of the Internal Revenue Code. The amendment proposed to reduce the normal retirement benefit for future service from $40 to $20 times years of service. Our objection to the reduction was made under Section 401(a)(4) of the Code because only four employees had retired during the period in which the $40 benefit was in effect, and three of these employees were officers of the Union.

8. The President of Local 688, John Naber, had also retired during this period. He is not, however, a party to this action.

On July 11, 1975, a proposed amendment was submitted to reduce the benefit from $40 to $20.55 for each year of credited service, retroactively effective to November 1, 1970. This amendment, if adopted, will reduce the existing benefits now being paid to the four retirees. It will also necessitate the return of the excess amounts already paid since 1970, either as a direct repayment or as an actuarial adjustment against their respective future benefits. The amendment will thus remove the discriminatory treatment apparent in the first proposed amendment.

Accordingly, it is our opinion based on the data submitted that your recently submitted amendment to reduce the benefit retroactively to $20.55 will not adversely affect the qualified status of the plan.

The trustees formally adopted Amendment 4 on September 9, 1975.

At a meeting held on the morning of September 24, 1975, representatives of Occidental informed the trustees that overpayments to the retirees for the period since their respective dates of retirement to September 1, 1975, were as follows:

| | |
|---|---|
| Harold J. Gibbons [9] | $17,416.80 |
| Richard Kavner [10] | $49,200.00 |
| John Naber | $16,880.00 |
| Charles Saffo | $14,393.00 |
| John Nedich [11] | $ 2,426.40 |

Occidental further advised the trustees that if each of the retirees' benefits, other than Kavner's, were reduced actuarially to provide for recoupment of the overpayments over a period of years, the reduction in benefits for each retiree would be calculated as follows:

| | Reduced from (Monthly) | Reduced to by reason of Amendment No. 4 (Monthly) | Reduced to for actuarial repayment of overpayments (Monthly) |
|---|---|---|---|
| Harold J. Gibbons | $960.00 | $493.20 | $357.11 |
| John Naber | $880.00 | $452.10 | $330.00 |
| Charles Saffo | $800.00 | $411.00 | $284.56 |
| John Nedich | $680.00 | $410.00 | $376.76 |

The trustees required Kavner to reimburse them in a lump sum.

The trustees held a special meeting on the afternoon of September 24, 1975. Gibbons, Naber, Saffo and Nedich attended the meeting. They were advised that it was necessary to reduce their benefits pursuant to Amendment 4, and that they would be required to reimburse the trustee either in a lump sum or by a further reduction in benefits. Gibbons and Saffo decided to reimburse the trustees by an actuarial reduction in benefits. It is unclear which option Naber and Nedich chose.

Gibbons, Saffo and Kavner instituted the present action in February, 1976, to have their pension benefits restored. The trial court found for them on the substantive issues. It held that the officers, trustees and Occidental had committed breaches of contract by reducing the payments to Gibbons and Saffo and by terminating the payments to Kavner. The trial court further held that Occidental was liable for actuarial malpractice and breach of contract for failing to inform the IRS of its guarantee and the effect of this guarantee on Plan B. It finally held that Occidental was liable for

9. The amount of overpayment to Gibbons includes excess payments based upon his incorrect service date.

10. Since the trustees determined that Kavner had not been entitled to receive any pension,

the amount of overpayment represents all sums paid to Kavner.

11. John Nedich is not a party to this action. He retired subsequent to the conditional adoption of Amendment 2.

fraud, malpractice, breach of fiduciary duty and breach of contract for failing to inform the trustees that Amendment 4 would reduce its liability on the guarantee.

## II.

### Occidental's Arguments

Occidental raises several issues on appeal. Its arguments can be better understood if we first examine the analysis followed by the trial court in finding Occidental liable. It determined that under the contract Occidental had guaranteed the retirees' monthly benefits for life at the $40 benefit level existent at the date of their retirement. It found that absent the guarantee, Plan B was actuarially unsound under the actuarial assumptions used by Occidental. Consequently, Occidental had assumed the risk of paying out more in benefits than it received in contributions since it could not require increased contributions to pay Exhibit B participants. It held that, under the circumstances, Occidental was a risk taker and not a mere stakeholder.

The trial court also found that as of January 1, 1974, Occidental had incurred an actuarial liability on its guarantee of $1,067,000, and that it had failed to reduce Plan B's unfunded actuarial liability by this amount in its actuarial reports to the trustees and in a valuation summary submitted to the IRS.[12] It concluded that the actuarial reports and valuation summary were misleading, deceptive and inaccurate, that they had caused the District Director of the IRS to question the actuarial soundness of Plan B in his July 12, 1974, letter to the trustees, and that they were a factor in the trustee's decision to adopt Amendment 4.

The trial court further found that Occidental knowingly failed to disclose to the trustees, in its reports to them, that Amendment 4 had the effect of reducing its actuarial liability on the guarantee by over $800,000. It concluded that the reports were false and materially misleading, and

that the trustees relied upon them in their decision to adopt Amendment 4.

The trial court held that Occidental was liable for actuarial malpractice and breach of its contract to provide actuarial services and reports. This holding was based on its failure to inform the IRS that it had guaranteed over $1,000,000 of what it showed as the unfunded actuarial liability of Plan B. It also held Occidental liable for fraud, malpractice, breach of fiduciary duty and breach of its contract to provide services and reports for failing to inform the trustees that Amendment 4 would reduce its own liability by over $800,000. It finally held that Occidental had committed breaches of contract in reducing its payments to Gibbons and Saffo and stopping its payments to Kavner.[13]

## A.

### The Guarantee

■ We initially consider Occidental's arguments that the trial court erred in its interpretation of the guarantee and the guarantee's relationship to the LHI–688 Pension Plan. Occidental first argues that the guarantee is not a promise by it to pay the retirees' monthly benefits for life at the $40 benefit level existing at the date of their retirements. It contends that the guarantee only provides for payment of benefits "which shall become payable under the Plan," not fixed dollar amounts.

We find little merit to this argument. At the time the group annuity contract was executed, Plan B, as amended, provided that:

The amount of Normal Retirement Annuity for a Participant in the employ of Teamsters Local 688 will be equal to $40, multiplied by the number of years of Credited Service completed by the Participant at his Normal Retirement Date, up to a maximum of thirty years. Monthly

---

12. The valuation summary was requested by the IRS after the trustees had submitted Amendment 2 to the IRS for approval.

13. Occidental was found liable to the retirees based upon third-party-beneficiary principles.

payments of such Normal Retirement Annuity will commence on the Participant's Normal Retirement Date and will be payable thereafter for as long as he lives.

Occidental was fully aware of this $40 benefit level, and it had based its guarantee and its contribution rate on that level. For example, a May 15, 1970, letter from a vice-president of Occidental stated that:

> Our actuaries have stated that a benefit of $40.00 per month for each year of service up to a maximum of 30 years can be provided by the following contributions:
>
> Effective January 1, 1970—$22.00 per week
> Effective January 1, 1971—$28.00 per week
> Effective January 1, 1972—$34.00 per week
> Effective January 1, 1973—$40.00 per week

In a September 8, 1970, letter acknowledging receipt of the names, birth dates and service dates of the Exhibit B participants, the same vice-president stated that this "will be the date upon which the proposed guarantee will be based."

Occidental next argues that the guarantee is not effective until the group annuity contract has been in force for twenty-five years. Neither the language of the guarantee nor the intent of the parties supports this argument. The language of the guarantee indicates that it was effective immediately and is to remain in effect as long as the other conditions of the contract are being met. The only mention of a twenty-five-year condition is in the first paragraph of the guarantee which states that even if the contract is discontinued after twenty-five years, Occidental will continue to pay benefits to Plan B participants. Moreover, the evidence shows that the officers of Local 688 were concerned with providing pension benefits to Exhibit B participants that would be guaranteed during their lifetimes. Occidental recognized this concern and attempted to provide for it in the guarantee. Since several individuals retired shortly after the guarantee was written, it is incredible to suggest that the negotiators for Local 688 would have been satisfied with a guarantee that would not take effect for twenty-five years.

Occidental also argues that the guarantee does not become effective until the Deposit Fund becomes exhausted. This fund contains the accumulated contributions of both Local 688 and LHI. The contract does not support this requirement.

Section 2.3 of the contract provides:

> Occidental will notify the Contractholder if the Deposit Fund is not sufficient to permit any withdrawal required by Section 3 with respect to any Participant who is not listed in the Schedule of Participants attached to the Contract as Exhibit B. The Contractholder will be required to make a Deposit sufficient to permit the withdrawal. The Deposit will be due on the date stated in the notice.

Under the interpretation urged by Occidental, the guarantee would effectively become a dead letter since the Deposit Fund cannot be exhausted. Occidental could merely use the fund to pay Exhibit B participants and then demand additional contributions for other participants in accordance with § 2.3. In order to prevent this, the contract provides in § 7.24:

> Occidental shall furnish the Contractholder with the following reports * * *.
>
> On a Contract Year basis:
>
> &ast; &ast; &ast; &ast; &ast; &ast;
>
> *Actuarial Report*—A report on the actuarial sufficiency of the funds maintained under the Contract. The report will indicate the level of Plan benefits which can be supported by the contributions which are being made in connection with the Plan. However, *nothing contained in the actuarial report can in any way alter the agreement evidenced in Section 3.7* [the guarantee]. (Emphasis added.)

In other words, if the contributions for Exhibit B participants are too small to pay Exhibit B retirees, it would be a violation of § 7.24 for Occidental to use money contributed for non-Exhibit B employees to make up that deficit and then demand higher

contributions for the non-Exhibit B people to make up for a resultant shortage in that account.

Occidental next argues that it could not pay the retirees' monthly benefits based on the $40 benefit level without having several "conditions" embodied in the contract broken. The first of these is the condition that the plan be maintained as a qualified plan. Section 7.22 of the contract provides:

> The [trustees agree] to keep and maintain the Plan as a qualified tax-exempt plan under the applicable code sections of the Internal Revenue Code and regulations and rulings of the Internal Revenue Service.

Occidental reasons that the IRS required the trustees to adopt Amendment 4 in order to remove plan discrimination in favor of union officials. Thus, it had no alternative but to reduce the benefit level from $40 to $20.55 so as to preserve the plan's tax-exempt status.

We do not agree that the IRS required the trustees to adopt Amendment 4. The July 12, 1974, letter from the IRS simply notes that Amendment 2, as adopted, was discriminatory under 26 U.S.C. § 401(a)(4) because the three retirees, who were union officers, would be receiving higher monthly benefits than subsequent retirees. The IRS was concerned with the differential benefit structure and not the level of benefits per se. Nothing in the letter suggests that the trustees must reduce the monthly benefits in order to remove the discrimination and preserve the plan's tax exemption. From what appears in this record, the IRS would not have objected if the trustees had rescinded their conditional adoption of Amendment 2 and returned to the original plan. Occidental obviously had an interest in not suggesting this as an alternative because Amendment 4 reduced its liability under the guarantee.

The second of these is the condition that both LHI and Local 688 contributions were to be used as a common fund to support all pension benefits under either Plans A or B. Occidental asserts that in 1975, the trustees directed it to separate Plans A and B because the IRS had objected to the "pooling" of contributions in order to support Local 688 pensions. It contends that this action deprived it of the single fund and, in effect, abrogated § 2.1 of the contract which provides that:

> in no event shall the amount payable to Occidental under the Contract be any less than the sum of the contributions which are payable with respect to all Participants under the Plan [which includes employees of both LHI and Local 688].

We agree with the trial court that the evidence does not support this contention.

At trial, Occidental attempted to prove that pooling was necessary in order to sustain the benefit levels requested by Local 688. Richard Eskoff, a vice-president of Occidental, related his experiences in negotiating the contract. He stated that after the initial meetings with Kavner in late 1969 and early 1970, Occidental proposed a pension program in May, 1970, with benefits almost identical to those provided under the original plan. Given the same benefit level, the various representatives of the LHI–688 Pension Plan saw no advantage in accepting the proposal. It was at that point that pooling was discussed as an alternative.[14] Occidental then reworked the contract so as to produce a higher benefit level. In doing so, it utilized contributions made on behalf of LHI to fund the higher benefits of Local 688.[15] Thus, it argues that pooling was an essential element of the contract.

This account is simply unsupported by the actuarial evidence. In its May, 1970, proposal, Occidental calculated the following contributions for LHI:

---

**14.** Eskoff could not recall who suggested the idea first.

**15.** Occidental also notes that in IRS Form 4573, the Application for Determination of tax-ex-

empt status, the trustees indicated that Local 688 would not be supplying all of the contributions necessary to provide benefits.

|  | Full-time employees | Part-time employees |
|---|---|---|
| Effective January 1, 1970 | $12.00 per week | $6.00 per week |
| Effective January 1, 1971 | $13.00 per week | $7.00 per week |
| Effective January 1, 1972 | $14.00 per week | $8.00 per week |

These contributions would have supported benefits for full-time employees of $300 per month for the first sixty months after retirement and $110 per month thereafter for life; and for part-time employees of $120 per month for the first sixty months and $44 per month thereafter.

In the final contract, the contributions were *less* than in the proposal:

Full-time employees . . . . . $12.00 per week

Part-time employees  . . . . $ 6.00 per week

The benefits for full-time LHI employees, however, were the same as in the proposal, and the benefits for part-time employees actually *increased* to $135 per month for sixty months and $90 per month thereafter. Considering this evidence, we fail to see how Occidental can claim that there were excess LHI contributions to, in effect, subsidize Local 688 benefits when the LHI contributions were less and the benefits greater under the "pooled" contract than under the segregated one.

The third of these conditions is the requirement in § 3.1 of the contract which provides that:

Occidental shall make withdrawals from the Deposit Fund to provide benefits under the Contract only as directed by the Contractholder.

Occidental claims that the trustees directed it to pay benefits based on the $20.55

level and that it would violate the contract if it did otherwise. This contention is merely a variation of Occidental's argument that it was not required to pay each of the retirees' monthly benefits at the $40 level because it had only promised to pay benefits "which shall become payable under the Plan." For the reasons previously discussed, we find little merit in this contention.

Occidental's final argument in regard to the guarantee is that the trial court's finding that Occidental's guarantee had a value of $1,067,000 for actuarial purposes was clearly erroneous. *See United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 92 L.Ed. 746 (1948); *Nye v. Blyth Eastman Dillon & Co., Inc.*, 588 F.2d 1189, 1196 (8th Cir. 1978); *Shull v. Dain, Kalman & Quail, Inc.*, 561 F.2d 152, 155 (8th Cir. 1977), *cert. denied*, 434 U.S. 1086, 98 S.Ct. 1281, 55 L.Ed.2d 792 (1978). We conclude that it is not.

Louis G. Prange, an actuary, prepared an estimated present value of the shortfall in Local 688 contributions compared to the value of benefits to be paid to Exhibit B participants. The present value of the shortfall indicates the cost to Occidental of its guarantee to Exhibit B participants. His calculations were based on assumptions and cost methods similar to those of Occidental and were as follows:

| Year | Present Value of Benefits | Allocated Share of Assets | Present Value of Future Employer Contributions for Schedule B Participants | Present Value of Shortfall (1)–(2)–(3) |
|---|---|---|---|---|
| 1970 | $1,215,000 | $ 33,000 | $365,000 | $ 818,000 |
| 1971 | $1,698,000 | $ 71,000 | $617,000 | $1,010,000 |

| Year | Present Value of Benefits | Allocated Share of Assets | Present Value of Future Employer Contributions for Schedule B Participants | Present Value of Shortfall (1)–(2)–(3) |
|---|---|---|---|---|
| 1972 | $1,745,000 | $134,000 | $586,000 | $1,026,000 |
| 1973 | $1,734,000 | $187,000 | $516,000 | $1,043,000 |
| 1974 | $1,695,000 | $221,000 | $406,000 | $1,067,000 |

Thus, at the time the contract was issued, Occidental apparently anticipated a loss of approximately $800,000, which amount increased to $1,067,000 in 1974.

Occidental asks us "to take judicial notice that insurance companies do not give away $1,000,000." We need not make a lengthy inquiry into Occidental's motives for its actions. We do note, however, that some evidence was presented at trial indicating that Occidental anticipated a higher rate of employee turnover than provided for in its actuarial calculations which would have reduced its potential liability. Moreover, Occidental may have desired to accommodate Gibbons because it handled several other pension plans involving Local 688 and the International.[16] As a vice-president in the International and as the Secretary-Treasurer of Local 688, Gibbons could have adversely affected Occidental's arrangements with these plans if he became displeased with Occidental.[17]

B.

*Remaining Arguments*

Occidental argues that the trial court was clearly erroneous in finding that Plan B was actuarially unsound under the actuarial assumptions used by Occidental excluding the guarantee. Occidental concedes that Plan B was actuarially unsound absent the pooling of Plans A and B.[18] We have previously concluded that pooling was not an integral part of the contract. Consequently, it is unnecessary for us to address this argument further.

Occidental raises several arguments concerning the trial court's findings of breach of contract, malpractice, fraud and breach of fiduciary duty. It contends that these findings are clearly erroneous, reiterating many of the arguments it made with respect to the guarantee. We have carefully examined these arguments and find them to be without merit.

Occidental finally argues that if it is held liable in damages for complying with IRS-

---

16. Occidental also handled the Teamsters Negotiated Pension Plan, a multi-employer pension plan, and the Teamsters Insurance and Welfare Fund. *See Celeste M. Castello v. Ron Gamache, et al.*, 593 F.2d 358, 359 (8th Cir., 1979).

17. Occidental also argues that it would be improper, under 26 U.S.C. § 412(c)(2), for it to include the $1,067,000 as a pension plan asset. Insofar as the trial court did not require it to do so, we need not decide the issue. Louis Prange suggested several alternative methods of disclosing the value of the guarantee.

18. Louis Prange demonstrated that expected contributions of Local 688 were significantly less than the minimum funding necessary to sustain the benefit level. His calculations were as follows:

| Plan Year | Plan B | |
| | Minimum | Expected |
|---|---|---|
| 1970 | $115,784 | $30,888 |
| 1971 | $138,413 | $72,800 |
| 1972 | $119,734 | $83,096 |
| 1973 | $113,091 | $81,120 |
| 1974 | $131,523 | $87,360 |

required changes to the LHI–688 Pension Plan, it was deprived of due process. As we have previously concluded that the IRS did not require these changes, we find this argument to be without merit.

### III.

### *The Remaining Appellants' Arguments*

■ The trustees of the LHI–688 Pension Plan and the officers of Local 688 raise several additional issues on appeal. They argue, initially, that the trial court erred in determining that the trustees acted in violation of the plan and the trust agreement when, in accordance with Amendment 4, they directed Occidental to change payments to the retirees.[19] The trustees and officers contend that the retirees' pension rights are merely contractual and are governed by the terms of the plan documents. Since Plan B allowed the trustees to amend it, the retirees' rights could be adversely affected at a later date, provided that the trustees acted reasonably and in a manner consistent with the purposes of the trust agreement and the plan. When the IRS disqualified the plan and found it to be severely underfunded, the trustees were confronted with a situation that endangered the plan's survival. Under the circumstances, they argue it was appropriate and reasonable for them to adopt Amendment 4, and that their judgment should not be overturned by the trial court.

■ We disagree with the analysis of the trustees and officers. The retirees' pension rights are not as amorphous as they suggest. Ordinarily, pension rights, once they have vested, may not be altered without the pensioner's consent.[20] *Allied Chemical & Alkali Workers v. P. P. G. Co.*, 404 U.S. 157, 181 n.20, 92 S.Ct. 383, 30 L.Ed.2d 341 (1971); see Note, *Pension Plans and the Rights of the Retired Worker*, 70 Colum.L.Rev. 909, 916–920 (1970). The retirees' pension rights were vested as they had complied with all conditions entitling them to participate in the plan[21] and had begun to receive benefits under it. *See Molumby v. Shapleigh Hardware Company*, 395 S.W.2d 221, 227 (Mo.Ct.App. 1965); *Feinberg v. Pfeiffer Company*, 322 S.W.2d 163 (Mo.Ct.App. 1959).[22] Moreover, the trustees' ability to divest a retiree of his pension benefits was strictly limited by § 10.5 of the pension plan which provides that:

> [i]n no event may any amendment be made to the Plan which:
>
>   *    *    *    *    *    *
>
>   (b) will divest any Participant of any benefit credited to him under the Plan before the effective date of the amendment, except as the same may be required by the U. S. Internal Revenue Service as a condition of preserving the Trust's Federal tax exempt status.

We also disagree with the trustees and officers that the IRS ever disqualified the plan. The August 11, 1975, letter from the IRS speaks of the "unexecuted amendment" that "would cause the above-named plan to fail of qualification." Our fundamental problem with their analysis, however, is the implication that there is a causal

---

**19.** They do not contest the trial court's findings that the trustees were under the domination and control of Local 688 and that Local 688 permitted the trustees to change retirees' payments.

**20.** Section 203(a) of the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. §.1053(a), sharply limits the situations in which vested rights can be divested. *Henry Winer v. Edison Brothers Stores Pension Plan*, 593 F.2d 307, 310–311 (8th Cir., 1979). ERISA § 203(a) is not applicable to this case, however, since the decision to reduce or terminate retirees' benefits occurred prior to January 1, 1976. *See Henry Winer v. Edison Brothers Stores Pension Plan, supra* at 311–313.

**21.** We conclude later in the opinion, however, that Kavner did not meet the plan's eligibility requirement and that he and Gibbons committed fraud with respect to their service dates.

**22.** ERISA § 514(a), 29 U.S.C. § 1144(a), pre-empted all state law as it might relate to any employee benefit plan, with a few exceptions, effective January 1, 1975, although ERISA § 203(a) did not become effective until after December 31, 1975. Note 19, *supra*. During this "gap" period, however, we may properly look to pre-ERISA state law. *See Keller v. Graphic Systems of Akron, Inc.*, 422 F.Supp. 1005, 1007–1009 (N.D.Ohio 1976). *But see Amory v. Boyden Associates*, 434 F.Supp. 671 (S.D.N.Y. 1976).

connection between the plan's underfunding and a disqualification. The IRS did not suggest that the plan would be disqualified unless the trustees corrected the underfunding. In fact, the trial court found that the trustees were unreasonable in concluding that the IRS required them to reduce retirees' benefits in an amount sufficient to make the plan actuarially sound in order to maintain the plan's qualification. This finding is not clearly erroneous.

The IRS commented on the actuarial soundness of the plan during its analysis of whether the increase in Local 688 benefits, occurring in 1971, was intended to be a permanent part of the plan or whether it was intended to be a temporary increase designed primarily to benefit former union officers. It observed that the plan's unfunded liability had increased between January 1, 1970, and January 1, 1974. It implied that, since this situation could not go on indefinitely, Amendment 2 was simply another step in an overall plan to reward the former union officers by increasing benefit levels during the period of their retirement.[23] The IRS concluded that if Amendment 2 were adopted, the plan would be disqualified. It did not, however, condition the plan's continued qualification on the removal of any underfunding.

We also observe that the trustees could not have adopted those portions of Amendment 4 which divested the retirees of their pension rights without violating § 10.5 of the plan unless the IRS required them to do so in order to preserve the plan's tax-exempt status. We conclude that the IRS did not. As we have previously observed in

Part II.A., there is no language in either letter from the IRS to suggest that the plan would be disqualified unless the trustees reduced the retirees' pension benefits. The August 11, 1975, letter merely notes that Amendment 4 eliminated the objectionable features of Amendment 2. The trustees could have rescinded their conditional adoption of Amendment 2 and returned to the original plan.[24]

The trustees and officers finally argue that several other findings of the trial court are clearly erroneous. To understand these arguments, we set out in some detail additional information concerning Gibbons' and Kavner's employment background.

Gibbons was first employed by the American Federation of Teachers in Chicago in the early 1930's. In 1936, he became the Assistant Director of the CIO in Chicago. From 1937 until 1940, he was Subregional Director of the Textile Workers Union in Louisville, Kentucky. He was assigned by the Textile Workers to work in Kansas City, Missouri, in 1940. In 1941, he was hired as the Chief Executive Officer of the St. Louis Joint Board of the International Retail, Wholesale and Department Store Employees Union, CIO. In 1948, he was instrumental in disaffiliating the St. Louis Joint Board from the International Retail, Wholesale and Department Store Employees Union. The St. Louis Joint Board continued as an independent organization until 1949, when it merged with Local 688. Prior to the merger in 1949, the St. Louis Joint Board had no affiliation with the Teamsters. Local 688 preexisted the merger and was separate and distinct from the St.

23. The IRS did not have before it the evidence showing that the plan was not actuarially unsound since Occidental had guaranteed the benefits of Exhibit B participants. *See* Part II.A., *supra*.

24. There is some suggestion in the trial court's decision that Amendment 4 was not adopted in good faith. The evidence does indicate some self-dealing on behalf of the new officers of Local 688. An unknown portion of the reduction in benefits was attributable to changes in the plan that were unnecessary to correct either the underfunding or the impermissible discrimination. Amendment 4 not only reduced

retirees' pensions, it (1) increased the break-in-service provisions from twelve months to forty-eight months; (2) reduced the minimum service necessary to qualify from twenty years to fifteen years; (3) provided for early retirement at age fifty with ten years of service; and (4) provided for early vesting. The only individual who benefited from increasing the break-in-service provision to forty-eight months was Ronald Gamache, the new Secretary-Treasurer of Local 688. Moreover, there is no evidence that Amendment 4 actually eliminated the purported underfunding.

Louis Joint Board. Thus, Gibbons' first employment by Local 688 was in 1949.

Kavner was employed by the International Retail, Wholesale and Department Store Employees Union, CIO, from 1939 until 1942, when he entered the armed services. In 1946, Kavner returned and was reemployed by the same organization. In the latter part of 1946, Kavner was assigned by the International to St. Louis. He remained in St. Louis until the merger in 1949, at which time he, too, was first employed by Local 688.

From February, 1954, until January, 1955, Kavner worked on a special organizing program with the Missouri-Kansas Conference of Teamsters and from February, 1955, until February, 1958, he worked as a "trouble shooter" for the Central States Conference. Kavner received a written leave of absence from Local 688 for both assignments. From March, 1958, through December, 1963, Kavner was employed by the Teamsters as a General Organizer. During this period, his salary, expenses and fringe benefits were paid by the International. He did not receive a written leave of absence for this assignment.

■ On the basis of the merger of the St. Louis Joint Board with Local 688, Gibbons and Kavner claimed service dates from 1938 and 1939, respectively, on Exhibit B. The trustees and officers argue that in doing so, Kavner and Gibbons perpetrated a fraud on the plan. The trial court found that they had not committed any fraud. We conclude that this finding is clearly erroneous.

At the time Gibbons and Kavner retired, there was no plan provision that authorized credit for past service with any employer other than Local 688. Section 1.11(a) of the plan provides:

*Credited Past Service*—Each Employee who is in the employ of the Employer on the Effective Date will be credited with one year of Credited Past Service for each calendar year prior to the Effective Date in which he had at least 300 hours

of continuous employment as an Employee or ten weeks in the armed forces of the United States.

An "Employee" is defined as an employee of Local 688 under Plan B. Gibbons and Kavner were aware of this provision yet they claimed past service credits from 1938 and 1939, respectively, although 1949 was the earliest date Local 688 had employed either of them. Moreover, employees of other merged unions were not given credited service for years of employment prior to their employment directly by Local 688.

The trustees also determined that Kavner suffered a break in service within the meaning of Plan B from March, 1958, through December, 1963, when he was employed as a General Organizer for the International. Consequently, he did not meet the plan's eligibility requirements for benefits. The trial court found that Kavner did not have a break in service. We conclude that this finding is clearly erroneous.

The plan provided that an employee's credited service would be broken if he left the service of Local 688 for a period of at least fifty-two consecutive weeks unless the employee has been granted a leave of absence in writing in a manner consistently and uniformly applied to all other employees or was in the armed forces of the United States. Kavner contends that he was granted an oral leave of absence by Gibbons when he accepted employment as a General Organizer. It is clear, however, that the plan requires a written leave of absence in order to avoid a break in service. Kavner was aware of this requirement and had obtained written leaves of absence when he had accepted other positions outside of Local 688. Moreover, since other employees suffered breaks in service upon receiving transfers to other Teamster organizations, allowing Kavner to utilize an oral leave of absence would violate the plan's requirement of uniform and consistent application.[25]

25. Kavner will continue to receive deferred compensation from Local 688 of $720 per month, $300 per month from the Central States

Pension Fund, $1,046 per month from the Affiliates Pension Plan, $108 per month from the Banquet Foods Pension Plan, $1,300 per month

We conclude that under the circumstances, the trustees acted reasonably in reducing Gibbons' monthly benefit from $1,200 to $960 because of his decrease in years of credited service, and in discontinuing Kavner's $1,200 monthly benefit because of his break in service and seeking to recover the related overpayments.[26]

## IV.

### Conclusion

The trial court's decision with respect to Saffo is affirmed. Its decision with respect to Gibbons is affirmed insofar as it relates to the decrease in the monthly benefit level, and reversed insofar as it relates to the reduction in benefits due to the incorrect service date. Its decision with respect to Kavner is reversed.

With respect to the damage issues, the trial court indicated that it was inclined to order payments of back benefits due, declare the rights of the parties under the pension plan and order continued payment of the monthly benefits. In that event, Saffo would be entitled to receive a monthly payment of $800 and Gibbons would be entitled to receive a monthly payment of $960. Occidental would make these payments out of the assets of Plan B and, in accordance with its guarantee, would be liable for any deficiencies. Saffo and Gibbons would also be entitled to receive back payments. The trial court also permitted the parties to agree upon a proper amount of damages, including a lump sum representing the present value of the retirees' benefits. The parties obviously retain this option.

The decision of the trial court is affirmed in part, reversed in part and remanded for further proceedings consistent with this opinion.

Each party shall bear its own costs.

from Labor Management Service Corporation, $300 per month from Local 102 and $300 per month from Council Plaza Redevelopment Corporation.

26. Due to our disposition of the case, it is unnecessary for us to determine whether Kavner's retirement was merely a sham.

BENSON, Chief District Judge, concurring in part and dissenting in part.

I concur in the holding that the trustees acted reasonably in reducing Gibbons' monthly pension from $1,200 to $960 because of the decrease in his years of credited service, and in discontinuing Kavner's pension because of a break in service. Further, I would concur in a holding that the trustees had no authority to reduce Gibbons' and Saffo's monthly pensions to implement Amendment 4 unless such reduction was required to maintain the plan as a qualified plan, but will offer a further comment on the effect of such a holding. With respect to the holding of liability on the part of Occidental, I respectfully dissent.

When the trustees approached Occidental to negotiate the payment of benefits under a group annuity contract, they were interested in obtaining a benefit level that was more advantageous than under the original plan. Occidental's first set of figures provided for a level of benefits that was almost identical to the original plan. This proposal was not acceptable to the trustees, so the pooling of the LHI–688 Plan funds was discussed. It is immaterial who initiated the discussion. It is clear that only the employees of Local 688 stood to gain from pooled funding, and that it was the trustees who pursued the idea. Occidental's actuaries prepared a second proposed schedule of contributions and level of benefits based upon a pooled method of funding. Under this proposal, Local 688 retirees would receive a monthly pension of $40 per year of credited service, a figure which was considerably higher than the benefit level under the original plan.[1] The trustees accepted this proposal and incorporated the $40 benefit level into Plan B. The proposed schedule of employer contributions, which was also based upon pooled funding, was attached to the group annuity contract as Exhibit C and made a part thereof.

1. Occidental informed the trustees that Plan B would not be actuarially sound if it were isolated from Plan A, and that a considerably higher contribution rate would be necessary if Local 688 contributions were to fully support the $40 benefit level for Local 688 employees.

Both Occidental and the trustees expressed serious doubt as to whether the IRS would approve the LHI–688 Plan on a pooled funding basis. The trustees were responsible for filing an application with the IRS for a determination of tax-exempt status. Prior to the submission of the plan to the IRS, Occidental wrote to the trustees to confirm that the legal and binding effect of the group annuity contract was contingent upon IRS approval of the LHI–688 Plan. The trustees fully intended to submit the LHI–688 Plan to the IRS as a single plan with a common fund, but with different benefit and contribution levels for the two sub-plans. However, rather than filing a single application, they filed separate applications for determination as to Plans A and B. The applications indicated that not all of the contributions were to be paid by the employer in question, and the schedule of contributions (Exhibit C to the group annuity contract) was submitted as an explanatory reference. The explanation on the applications may not have been clear to the IRS because it issued separate determinations approving tax-exempt status for Plans A and B without comment on the fact that a pooled method of funding was being utilized. The trustees informed Occidental that the LHI–688 Plan had been approved, and both Occidental and the trustees thereafter proceeded on the assumption that the IRS had approved the pooled funding. Whether or not pooled funding was appropriate for the LHI–688 Plan, the evidence clearly and overwhelmingly shows that the trustees and Occidental both considered pooled funding to be a basis of their bargain, and that it was an integral part of the group annuity contract.

Under § 3.7 of the group annuity contract, Occidental guaranteed (1) during the first 25 years of the contract, to pay the pensions of the Exhibit B retirees to the extent the schedule of contributions was insufficient to support the level of benefits under the plan, provided all employer contributions were made as scheduled; and (2) if the contract were discontinued after 25 years, and all conditions had been met during that time, to pay the entire pensions of the Exhibit B participants.

If, at any time during the first 25 years of the contract, the amount in the deposit fund were insufficient to pay the full benefits owed to all retirees, the amount in the fund would be prorated among the retirees in proportion to the amounts of their monthly pensions. Occidental would then be required, under its guarantee, to pay the balance of the benefits owed to Exhibit B retirees, and the employer would be required to make a deposit sufficient to pay the balance of the benefits owed to non-Exhibit B retirees.

The trial court adopted as its finding the opinion of plaintiffs' expert, Louis G. Prange, that Occidental's guarantee had an actuarial value of approximately $800,000 at the time the contract was executed, which value increased to over $1,000,000 by 1974. This "value" represented the amount by which the present value of Local 688 contributions for Exhibit B participants was exceeded by the present value of benefits to be paid to Exhibit B participants, without taking into account any pooling of the funds of Plans A and B.

It is undisputed that Plan B standing alone was never actuarially sound. The Local 688 contribution schedule prepared by Occidental was never intended to fully support the benefit level for Local 688 employees. Pursuant to the parties' agreement, Occidental's actuaries prepared the schedule of contributions and benefit levels on a pooled funding basis.

Under the evidence, Occidental had no reason to suspect that the IRS had not approved the LHI–688 Plan as a pooled fund. The first indication to Occidental that the IRS had not granted such approval came in 1974 when the IRS requested segregated financial data for Plan B in connection with its consideration of Amendment 2. Under these circumstances, Occidental did not act inappropriately in calculating the contribution schedules and benefit levels on a pooled funding basis.

Occidental did not have an anticipated loss of approximately $800,000 at the time it entered into the contract. The intent of the parties was that the guarantee consti-

tuted an undertaking on the part of Occidental to pay benefits to the Exhibit B retirees to the extent the pooled fund could not support the payment of such benefits. It is undisputed that the LHI–688 Plan was never actuarially unsound when considered as a pooled fund. Consequently, there was no basis for the assignment of an actuarial value to Occidental's guarantee. The trial court's findings with respect to the actuarial value of the guarantee are clearly erroneous.

The trial court's findings of breach of contract, malpractice, fraud and breach of fiduciary duty on the part of Occidental are also clearly erroneous. The evidence clearly shows that the problems which arose from the "purported underfunding" of Plan B stemmed from the trustees and not from Occidental. The trustees' applications to the IRS did not indicate clearly that a pooled method of funding was being employed.[2] The IRS apparently did not become aware of the pooled funding until Amendment 2 was submitted in 1974. The trustees' adoption of Amendment 4 was motivated in part by the IRS's questioning of the financial soundness of Plan B. The adoption of Amendment 4 in turn resulted in the reduction of Gibbons' and Saffo's pensions.

The trustees' adoption of Amendment 4 was also motivated in part by their desire to increase the number of Local 688 employees who would be eligible for benefits, particularly themselves. I agree that the trustees had no authority to reduce Saffo's and Gibbons' pensions to implement Amendment 4. However, the effect of this part of the

court's holding deserves further comment. A review of the history of Plan B will be helpful to this discussion.

Under the original version of Plan B, employees would receive a pension of $300 per month for the first 60 months of their retirement and $110 per month thereafter. In 1971, the plan was amended to increase monthly benefits to $40 per year of credited service. Amendment 2, which would have gone into effect on January 1, 1974 if approved by the IRS, provided for reduction of the monthly benefit level from $40 to $20 per year of credited service for all future retirees. Thus, it would not have applied to the four employees who had retired while the $40 benefit level was in effect, including Gibbons, Kavner and Saffo.

In ruling on Amendment 2, the District Director of the IRS held that the reduction of benefits after only a short time, without evidence of business necessity, created a presumption that the plan was not intended to be permanent from the time the $40 benefit level was added. The District Director also noted the unfunded liability of Plan B had been increasing, and that three of the four employees who had retired at the $40 benefit level were union officers, members of the class in whose favor discrimination is prohibited by 26 U.S.C. § 401(a)(4). Amendment 2 was held to be a partial termination of Plan B, which would adversely affect the plan's qualification.

The trustees appealed this decision to the Commissioner, who affirmed the adverse ruling both as to lack of business necessity and as to the discriminatory effect of the amendment. However, the Commissioner

---

2. The IRS "Application for Determination" form included three categories to describe the plan's employer contribution formula: "All," "Balance necessary," and "Other (Specify)." The trustees checked the "other" category and designated Exhibit C to the group annuity contract as the explanation of the formula.

Exhibit C provided:

SCHEDULE OF PARTICIPANT CONTRIBUTIONS
(as referred to in Section 2.1 of Contract)
Scale of contributions payable under the Plan as of January 1, 1970 with respect to each active participant in the Plan:
As to St. Louis Labor Health Institute—

| Full-time employees | $12.00 per week per active participant |
|---|---|

| Part-time employees | $ 6.00 per week per active participant |
|---|---|

As to Teamsters Local 688—

| Calendar year 1970 | $22.00 per week per active participant |
|---|---|
| Calendar year 1971 | $28.00 per week per active participant |
| Calendar year 1972 | $34.00 per week per active participant |
| Calendar year 1973 | $40.00 per week per active participant |

This was the only explanation in the application as to how the LHI–688 Plan was funded.

ruled the discrimination question was dispositive, stating:

As it turns out, the $40 per month rate obtains only during a relatively short period of time and benefits primarily officers of the Employer rather than employees in general.

Thus, it is our conclusion that the partial termination of the Plan resulting from Amendment No. 2 produced discrimination of the type prohibited by section 401(a)(4) of the Code. In this regard, it is immaterial whether or not there was a valid business reason for the partial termination, and whether or not Plan A and Plan B are treated as one plan or as separate plans.

The trustees subsequently adopted Amendment 4, which provided for a reduction of monthly benefits from $40 to $20.55 per year of credited service for all employees, including those who had already retired under the $40 level. When Amendment 4 was submitted for IRS approval, the District Director held that if the "excess" amounts already paid to the retired employees were recouped, Amendment 4 would remove the discriminatory treatment that had been apparent in Amendment 2, and would not adversely affect the plan's qualification. Thereafter, Amendment 4 was put into effect, and the trustees began to recoup the "overpayments."

Under the court's holding, Gibbons and Saffo will be entitled to monthly benefits of $40 per year of credited service, just as they were prior to the adoption of Amendment 4.[3] Employees who retire after the effective date of Amendment 4 will be entitled to monthly benefits of $20.55 per year of credited service as provided by Amendment 4. The effect of the court's holding is to limit Amendment 4 to prospective application, just as Amendment 2 was intended to do. And, as was the case with Amendment 2, the $40 rate will primarily benefit officers of Local 688. Thus, the court's holding will reinstate the discriminatory effect that was present in Amendment 2.[4]

In order to preserve the plan's qualification as a tax-exempt plan, the trustees will have no choice but to eliminate the discrimination through revocation of Amendment 4 and reinstatement of the $40 benefit level for all Local 688 employees. Because a pooled method of funding is no longer being used, a substantial increase in Local 688's contributions to the plan will be required to support the higher level of benefits. There is substantial evidence in the record which indicates that Local 688 will not be able to afford this increase in contributions and may be forced to abandon the plan.

---

3. Other employees who retired prior to the effective date of Amendment 4 will also be entitled to reinstatement of their pensions at the $40 rate. This, of course, does not include Kavner. His pension was discontinued because of a break in service, not because of Amendment 4.

4. Such discrimination is prohibited by 26 U.S.C. § 401(a)(4), and is also contrary to § 10.5 of the LHI–688 Plan, which provides in part:

In no event may any amendment be made to the Plan which:

\* \* \* \* \* \*

(c) will cause or effect any discrimination in favor of officers or individuals whose principal duties consist of supervising the work of others, or highly compensated employees.